**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-5010

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NATHAN A. CHAPMAN, JR.,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  William D. Quarles, Jr., District Judge. (CR-03-301-WDQ)

Argued:  September 20, 2006          Decided:  December 8, 2006

Before WILLIAMS and TRAXLER, Circuit Judges, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by unpublished opinion.  Judge Traxler wrote the opinion, in which Judge Williams and Judge Floyd joined.

**ARGUED:** William R. Martin, BLANK ROME, L.L.P., Washington, D.C., for Appellant.  Jefferson McClure Gray, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Craig M. Wolff, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Circuit Judge:

Nathan Chapman was the chairman of the board, chief executive officer, and majority shareholder of various financial services companies including The Chapman Company, Chapman Capital Management, and, later, eChapman.com. Chapman was convicted of numerous crimes stemming from his management of the various companies and from his conduct during the initial public offering ("IPO") of the stock of eChapman. Chapman appeals, raising multiple challenges to his convictions, sentence, and restitution award. We affirm Chapman's convictions and the restitution award, but we vacate his sentence and remand for re-sentencing.

I.

The charges for which Chapman was convicted stemmed from two relatively distinct sets of facts: Chapman's conduct in connection with the IPO of eChapman stock and his improper use of "business development funds" provided to him by his various companies. We will set out the facts surrounding the IPO first and then discuss Chapman's use of the business development funds. The facts that we set out, of course, are those established at trial when the evidence is viewed in the light most favorable to the government.

A.

After working as a public accountant for several years, Chapman started his own financial services companies: The Chapman Company, an investment banking and retail brokerage firm, and

3

Chapman Capital Management, an investment advisory firm that managed money for public and private pension funds.

Chapman, through Chapman Capital Management, later took over management and operation of Minority Equity Trust, a "fund of funds" that managed and invested funds for several pension funds, including the State Retirement and Pension System of Maryland (the "Maryland Pension System"). Minority Equity Trust used multiple independent investment advisory firms (called subadvisors) to manage the fund and allotted a portion of the total funds it managed to each subadvisor for investing and managing. The subadvisors had different investment styles or specialties--some invested in growth stocks, others in small-capitalization companies, etc. All of the subadvisors were controlled by women or minorities.

When Chapman took over Minority Equity Trust, he renamed it Domestic Emerging Markets Minority Equity Trust (DEM-MET), but its purpose (to provide opportunities for minority money managers) remained the same, and all of the subadvisors in DEM-MET were women or minorities. Shortly after Chapman took over DEM-MET, one of the subadvisors left. Chapman replaced that subadvisor with Alan Bond, who at the time was enjoying great success on Wall Street and made regular appearances on a PBS television show focusing on investment and finance. Bond's investment specialty was large-cap growth

stocks. He received from DEM-MET an initial allocation of $10 million to manage.

Under the rules established by Chapman Capital Management, DEM-MET subadvisors were required to invest in stocks found on a list of pre-approved companies or get approval before investing in a stock not on the list. Subadvisors could not invest in stocks where liquidity of the stocks was limited by the company size or insider ownership of more than 50% of the company shares. The various pension funds participating in DEM-MET also had certain restrictions on the stocks that could be purchased by the subadvisors.

When Chapman took over DEM-MET, his companies were private, and he was the majority stockholder. In 1997, he spun off Chapman Capital Management from The Chapman Company, placed each company under a separate holding company, and announced that he would hold IPOs for 40% of the outstanding stock in each holding company. The IPOs were structured as "firm offer" IPOs--unless the minimum number of shares specified in the registration statement were sold, the IPO would not proceed.

The IPOs were successful, in that the minimum number of shares were sold. In both cases, however, the minimum number of shares were sold only because of large purchases of the stock by Alan Bond. Bond used DEM-MET funds to purchase the shares in one of the IPOs and used funds of other clients to buy into the other IPO.

5

Bond testified at trial that the Chapman IPOs were not a good fit for him--the stock was not liquid, given that the companies were small and Chapman retained a majority interest, and there was a great deal of risk associated with the ventures. Bond also testified that the companies were much smaller than the large-cap growth stocks he focused on. He testified that the only reason he bought into the IPOs was because Chapman pressured him and assured him that more DEM-MET money to manage would come his way if Bond invested in the IPOs. Bond was concerned that there might be a conflict of interest in using DEM-MET funds to buy into the IPOs, since Chapman (through Chapman Capital Management) controlled DEM-MET and was the one selling and benefitting from the IPOs. Chapman assured Bond that there was no conflict, and Bond ultimately invested in the IPOs.

In May 1999, Chapman began planning a third IPO. This time he was going to reunite Chapman Holdings and Chapman Capital Management Holdings and turn them into an internet-based financial services company called eChapman.com. Chapman initially hoped to sell 3.3 million shares at $14-16 dollars a share. Chapman's early efforts to get investors to commit to purchasing shares in the eChapman IPO, however, were not overly successful.

In December 1999, Alan Bond was indicted for a kickback scheme involving a New York stock broker. After the indictment, many of Bond's clients abandoned him, and DEM-MET's outside advisor

6

recommended that Bond be terminated as subadvisor. Chapman, who was solely responsible for the decision, declined to terminate Bond. Not long after the indictment, Chapman visited Bond in New York. He told Bond that he was not going to fire him, but he also told Bond that he expected Bond to be the "pinch hitter in reserve" on the eChapman IPO. Bond understood that to mean that Chapman expected Bond to again help him out if the IPO was under-subscribed.

In early 2000, before the eChapman IPO opened, the "dot-com bubble" burst, and the stock value of many Internet stocks dropped dramatically. Chapman had already spent a great deal of money in legal and accounting fees preparing for the IPO, so he pressed on despite the less favorable market conditions. Chapman reduced the number of shares to be offered to 1.26 million and lowered the price to $13 per share. Investors, however, were still expressing little interest in the eChapman IPO. The discussion about the IPO in the financial press was almost uniformly negative. Analysts believed that the $13 per share price was too high and that the Chapman companies that were merging to form eChapman did not have a good track record. There was also concern that the structuring of the deal created an incentive for the owners of the companies that were being merged to sell their shares as soon as eChapman was born, which would create an immediate downward pressure on the price of an already overvalued stock.

7

Faced with limited outside interest in the IPO, Chapman again pressured Bond to buy into the eChapman IPO. Bond told Chapman he could not invest, in part because he had so few clients left after the indictment (only six, including DEM-MET), and eChapman did not fit within the needs of any of those clients. Chapman persisted, and Bond eventually capitulated, agreeing to buy 200,000 shares with DEM-MET funds. The purchase of the eChapman IPO violated DEM-MET's investment guidelines, and Bond testified at trial that the purchase was not consistent with his usual stock selection strategy. Chapman also pressured another DEM-MET subadvisor to buy eChapman stock. That subadvisor (who bought 20,000 shares), testified that without Chapman's pressure, "I would not have participated, period." J.A. 980.

The eChapman IPO closed on June 20, 2000, and public trading of the stock began the next day. By the end of the first day of public trading, the stock, which had been offered at $13 per share, was trading for between $7 and $8 per share. The 200,000 shares that Bond had bought for DEM-MET thus lost more than $1 million in value in a single day.

A few days later, Chapman called Bond again and told him that an underwriter had dropped out, which meant that the IPO was under-subscribed and should not have proceeded. Chapman pressured Bond to buy still more eChapman stock at the original offering price rather than its then-current price of around $7 per share. When

Bond protested, Chapman promised Bond that he would give him more DEM-MET money to manage if he bought more eChapman shares. Bond capitulated and agreed to buy for DEM-MET's account another 175,000 shares of eChapman stock at $13 per share. In late June, Bond bought the additional shares, causing an immediate loss to DEM-MET of 50% of its investment. Bond and Chapman structured the purchases to make it look as if the stocks had been bought on the day that trading opened. Bond had to liquidate well-performing stocks in DEM-MET's portfolio to raise the cash necessary to buy the eChapman stock.

Chapman quickly followed through on his promise to Bond. He gave Bond a $1.5 million eChapman investment portfolio to manage, and he also gave Bond another $10 million in DEM-MET funds to manage. Bond used much of the additional DEM-MET money to buy back the stock that he had liquidated to finance the eChapman purchase.

In August 2001, Bond was indicted a second time on federal securities charges. These charges accused Bond of "cherry picking" -- day-trading in the same stocks in his personal account that he was trading in for DEM-MET and two other clients, and assigning the profitable trades to himself and the unprofitable ones to the clients. At that point, Chapman terminated Bond as a DEM-MET subadvisor. Bond was convicted in 2002 on the cherry-picking charges, and he then pleaded guilty to the kickback charges.

Chapman's conduct in connection with the eChapman IPO formed the factual basis for multiple counts of mail and wire fraud, investment advisory fraud, and making false statements to the Securities and Exchange Commission. The jury ultimately convicted Chapman of eleven counts of wire fraud, two counts of mail fraud, three counts of investment advisory fraud, and one count of making a false statement to the SEC.

## B.

As chief executive officer of his various companies, Chapman regularly requested that "business development" checks (ranging from $500 to almost $10,000) be issued to him, to cover travel and other expenses associated with getting and maintaining clients. From 1997 to mid 2002, Chapman received more than $460,000 in business development funds. He always converted the checks to cash (that is, he did not deposit them in his checking account, but instead cashed them at the bank) and he never submitted receipts or other documentation to show how the money was spent.

During the time that he was getting the business development checks, however, Chapman was also making extensive use of the company credit card when he traveled. Hotel rooms, plane tickets, meals, etc., were placed on the credit card. According to the government, Chapman charged more than one million dollars on company credit cards during the period of time that he collected $460,000 in business development funds. Of those charges,

10

approximately $250,000 were for personal expenses, while somewhat less than $800,000 were for company-related travel and other business expenses.

The government presented fairly compelling evidence demonstrating that Chapman was using much of the business development cash to support his mistresses. From 1998-1999, Chapman gave nearly $50,000 in cash to Debra Humphries. And from 1998-2002, Chapman gave Yelinde Tyler more than $200,000 in cash, plus at least another $70,000 in gifts, trips, and meals. The government compiled a chart comparing the dates and amounts of business development checks received by Chapman and the dates and amounts of cash deposits into the women's bank accounts. While the correlation was not perfect, there was enough of a correlation that the jury could reasonably conclude that much of the business development cash was going to the mistresses, not to legitimate business expenses.

This improper use of the business development funds provided the factual basis for multiple counts of wire fraud, as well as several counts of making false statements on income tax returns. The jury convicted Chapman of four counts of wire fraud and two counts of making false statements on tax returns.

II.

Chapman, an African-American, contends that he is entitled to a new trial because the government used its peremptory strikes to

11

remove African-American females from the jury, in violation of Batson v. Kentucky, 476 U.S. 79 (1986), and its progeny. We find no reversible error.

"When making a Batson motion, the defendant must first make a prima facie showing of purposeful discrimination. Once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral [or gender-neutral] explanation for the challenge." United States v. Grimmond, 137 F.3d 823, 833-34 (4th Cir. 1998) (citation and internal quotation marks omitted). "If the prosecutor satisfies this requirement, the burden shifts back to the defendant to prove that the explanation given is a pretext for discrimination. The ultimate burden always rests with the opponent of the challenge to prove purposeful discrimination." Id. at 834 (citation and internal quotation marks omitted). When reviewing Batson challenges, we give "great deference" to the district court's determination of whether a strike was exercised for an impermissible reason. Id. at 833.

When selecting the jury, the government used five of its six peremptory challenges, and all of those challenges were used to remove black women from the jury panel.[1] After Chapman made his

---

[1]The government did not use its sixth peremptory strike, and two black males were seated on the jury. The government used none of the four strikes allotted to it for the selection of eight alternate jurors. The alternates selected included two black females and one black male.

12

Batson motion, the government explained its strikes as follows. As to Juror 23, the government stated, "[s]he's young. She works as an office assistant at Giant. You know, the other jurors were probably better able to appreciate some of the complicated evidence in this case." J.A. 206-07. As to Juror 37, the government explained that "[s]he came up to the bench and spoke here. I just had a reading of her as somewhat vacant. She just didn't seem as smart." J.A. 207. The government explained that it struck Juror 47 because "[s]he just seemed very unhappy to be here. That's what my observation of her was when she walked into the room. . . . I'm going on the basis of her demeanor and the way she's been looking at us." J.A. 208. As to Juror 51, the government stated that "[s]he's had her arms crossed the entire time she's been in here. . . . [S]he's got a hard look on her face. . . and just seems like someone who could be difficult in the jury room. . . . It was just her general demeanor. . . . She looked very fed up." J.A. 208-09. Finally, the government explained that it struck Juror 82 because she works "with the Office of the Public Defender in the city, and sometimes people who work for the Public Defender's Office have particular views about the Government." J.A. 209.

The district court concluded that the government's explanations for the strikes were race- and gender-neutral, and the court rejected Chapman's claim that the reasons given by the government were pretextual because they were not based on any

13

objective criteria. Accordingly, the district court denied Chapman's <u>Batson</u> motion.[2]

On appeal, Chapman suggests that the facial expression or demeanor of a potential juror is an impermissible basis for exercising a strike. We disagree.

This court has long recognized that a juror's demeanor is a neutral basis upon which to exercise a peremptory strike. <u>See</u> <u>United States v. Grandison</u>, 885 F.2d 143, 149 (4th Cir. 1989) ("Numerous valid factors may influence a prosecutor to strike a particular potential juror, including current and past employment, general appearance and demeanor. . . ." (internal quotation marks omitted)); <u>cf.</u> <u>Howard v. Moore</u>, 131 F.3d 399, 408 (4th Cir. 1997)

---

[2]After the government explained its reason for each strike, the district court, before hearing from Chapman, described each explanation as "not a pretext." <u>See</u> J.A. 207-09. As noted above, the question of pretext comes in at the third step of the <u>Batson</u> inquiry--if the defendant makes a <u>prima facie</u> showing, the government must articulate a race- and gender-neutral explanation for its strikes, and the defendant is then required to show that the articulated reason is pretext for unlawful discrimination. Since Chapman had made no argument at the time that the court declared the explanations to be non-pretextual, it is likely that the district court simply misspoke, intending to describe the explanations as neutral rather than non-pretextual. In any event, we note that counsel for Chapman had the opportunity to make his arguments as to why the government's explanations were pretext for unlawful discrimination, and the district court denied the <u>Batson</u> motion after hearing from Chapman. <u>See</u> J.A. 211. Thus, even if the district court prematurely (that is, before hearing from Chapman) concluded that the government's explanations for its strikes were not pretextual, any error was cured by the subsequent opportunity for Chapman to make his <u>Batson</u> argument. We also note that Chapman does not argue on appeal that the district court prevented him from adequately presenting his <u>Batson</u> claim.

14

(en banc) ("Both the prosecutor and defense counsel must be allowed to make credibility determinations when exercising peremptory challenges. For example, counsel may consider the characteristics of the other prospective jurors against whom peremptory challenges might be exercised; to reevaluate the mix of jurors and to take into account tone, demeanor, facial expression, emphasis--all those factors that make the words uttered by the prospective juror convincing or not." (internal quotation marks and alteration omitted)). If the district court did not observe the expression or demeanor that the attorney claimed justified the strike, the court may well conclude that the proffered explanation is not credible. There is, however, no requirement that the attorney exercising the strike offer objective evidence to support his view of the juror's demeanor. See Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (per curiam) ("The second step of [the Batson inquiry] process does not demand an explanation that is persuasive, or even plausible. At this second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (internal quotation marks and alteration omitted)); cf. Hernandez v. New York, 500 U.S. 352, 365 (1991) ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence

15

bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.  As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." (internal quotation marks omitted)).

In this case, the demeanor of the potential juror was the government's proffered explanation for many of its strikes. Because Chapman offered no evidence tending to show that these explanations were pretextual, the district court properly denied Chapman's objection as to those strikes.  See United States v. Cordoba-Mosquera, 212 F.3d 1194, 1198 (11th Cir. 2000) (per curiam) ("[W]e give great deference to the trial judge's determination that the peremptory strike was not racially motivated.  Deference is particularly warranted here, where the proffered race-neutral explanation centered on the juror's body language and mannerisms that signaled inattentiveness, behaviors that are especially given to on-the-spot interpretation." (citations and internal quotation marks omitted)); United States v. Love, 419 F.3d 825, 828 (8th Cir. 2005) (finding no error in denying Batson motion when district court believed prosecutor's explanation that he struck potential juror because she rolled her eyes at him, and defendant offered no persuasive evidence of pretext).

Chapman also contends that the other explanations proffered by the government (regarding a juror's age or occupation) were

16

pretextual because similarly-situated white jurors were not struck by the government. See Miller-El v. Dretke, 545 U.S. 231, 241 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."). For example, Chapman notes on appeal that the government did not strike three white jurors who were younger than Juror 23, even though the government contended that it struck Juror 23 in part because of her youth. Chapman also points to other white jurors accepted by the government who had low-level or low-skilled jobs. Since the government noted Juror 23's job as an office assistant when questioning her ability "to appreciate some of the complicated evidence in this case," J.A. 207, Chapman contends that the government's failure to strike the white low-skilled jurors suggests that the explanation for striking Juror 23 was pretext.

Chapman, however, never made these arguments to the district court. That is, he pointed to no similarly-situated jurors that were seated by the government. Instead, Chapman simply asserted that the government's explanations were pretext and argued that there must be some sort of objective standard before the government could strike a juror based on demeanor, an argument we have already rejected.

17

In this circuit, the failure to argue pretext after the challenged strikes have been explained constitutes a waiver of the initial Batson objection. See Davis v. Baltimore Gas & Elec. Co., 160 F.3d 1023, 1027 (4th Cir. 1998). The failure to argue a specific basis for pretext may likewise constitute a waiver of the right to make that specific challenge to the Batson ruling on appeal. If the issue is waived, the issue is not reviewable on appeal; an issue that is merely forfeited is reviewable for plain error. See United States v. Olano, 507 U.S. 725, 733 (1993); United States v. David, 83 F.3d 638, 641 n.5 (4th Cir. 1996). We need not decide, however, whether Chapman waived rather than forfeited his specific juror-comparison arguments. Assuming that it is appropriate to apply plain error review to these claims, we decline to exercise our discretion to notice and correct any error.

"In reviewing for plain error, we must affirm unless an appellant can show that (1) an error was made, (2) it was plain, and (3) it affected the appellant's substantial rights." United States v. Alerre, 430 F.3d 681, 689 (4th Cir. 2005), cert. denied, 126 S. Ct. 1925 (2006). "[T]he correction of plain error lies within our discretion, which we do not exercise unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted). An error is plain if it is obvious. See Olano, 507 U.S. at 734 (explaining that for purposes of plain-error review, "'[p]lain' is

18

synonymous with 'clear' or, equivalently, 'obvious'").  From the record before us, it is not obvious that any of the jurors pointed to by Chapman on appeal were sufficiently similar to the jurors struck by the government to give rise even to an inference of pretext.

The jurors who were accepted by the government but were younger than Juror 23 all had what appear to be higher-skilled jobs than Juror 23, while the accepted jurors with low-level or low-skilled jobs were older than Juror 23.  The age, occupation, and educational level of a potential juror are all permissible bases for the exercise of a strike, see Howard, 131 F.3d at 408, and there is nothing inherently pretextual about trading off one factor for another--for example, accepting a younger but more educated juror.  See United States v. Lane, 866 F.2d 103, 106 (4th Cir. 1989) ("In the selection of a jury panel, prosecutors and defense counsel use their peremptory challenges depending on many valid factors. For example, although one may be searching for jurors who have a certain characteristic such as a college degree, a juror who did not complete college may nevertheless be accepted because he possesses other desirable characteristics.").  Because the record before us does not clearly show that the government seated white or male jurors who were situated similarly to the black female jurors that it struck, we cannot conclude that the district court erred, let alone plainly erred, by denying Chapman's Batson motion.

III.

Chapman next contends that the district court erred by permitting lay witnesses called by the government to testify about the existence of a fiduciary duty on the part of Chapman and to give their opinion about whether Chapman breached that duty. And in a related argument, Chapman contends that the district court erred by precluding his expert witnesses from testifying about various aspects of the fiduciary-duty question.

A.

As noted above, the relationship between Bond and Chapman and Bond's use of DEM-MET money to buy into the eChapman IPOs provided the factual basis for many of the charges against Chapman. Some of those charges required the jury to consider whether fiduciary duties existed and whether Chapman breached those duties. At trial, the government did not present expert testimony on the definition, existence, or breach of fiduciary duty. It did, however, ask several of its lay witnesses questions about Chapman's fiduciary duties.

On appeal, Chapman contends that the fiduciary-duty testimony was in fact expert testimony. Because the witnesses were not identified as experts prior to trial and their opinions were not subjected to the reliability requirements of Rule 702 of the Federal Rules of Evidence, Chapman contends that the district court

erred by permitting lay witnesses to give what is properly viewed as expert testimony.[3]

Under Rule 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise," so long as "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 701, however, states that

> [i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701. Subparagraph (c), which was added to Rule 701 in 2000, was intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 Advisory Committee's note to 2000 Amendments.

---

[3]In his brief, Chapman suggests that expert testimony was required to establish the nature and scope of the fiduciary duties owed by the various parties involved in the transactions at issue. Chapman does not, however, contend that the absence of expert testimony renders the government's evidence insufficient to support his convictions. Under these circumstances, there is no reason for us to consider the abstract question of whether expert testimony was required in this case. We instead focus on the question of whether the district court erred by permitting lay witnesses to provide expert testimony.

"Rule 701 permits lay witnesses to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived."   Certain Underwriters at Lloyd's, London v. Sinkovich, 232 F.3d 200, 203 (4th Cir. 2000) (internal quotation marks omitted).  The rule does not, however,

> permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness.  A critical distinction between Rule 701 and Rule 702 testimony is that an expert witness must possess some specialized knowledge or skill or education that is not in the possession of the jurors.

Id. (citation and internal quotation marks omitted).  As we explain below, while most of the challenged testimony reflected the "particularized knowledge that the witness had by virtue of his position," United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir.) (internal quotation marks and alteration omitted), cert. denied, 126 S. Ct. 247 (2005), that knowledge did not render the witness's fiduciary-duty testimony improper under Rule 701.  See id. (concluding that police officer's testimony about how drug points operate and how heroin typically is packaged was admissible as lay witness testimony under Rule 701, because the testimony was based on the officer's observations and experience on prior drug arrests).  To the extent that any of the testimony might be viewed as improper expert testimony, its admission was harmless.

The testimony about which Chapman complains is that of various people who were involved in or affected by the Bond-

eChapman transactions: an employee of Tremont Advisors, the outside advisor to DEM-MET; two DEM-MET administrators; employees of two of the entities with funds invested in DEM-MET, Alliant Energy and the Maryland Pension System; and Alan Bond himself. When this testimony is read in context, it is clear that the witnesses were in the main talking about "historical or narrative facts" perceived by those witnesses, which is a proper subject of lay testimony. Sinkovich, 232 F.3d at 203.

For example, Cathy Sweeney, who worked for the outside advisor to DEM-MET, wrote Chapman a letter after Bond was indicted in which she recommended that Bond be terminated as a DEM-MET subadvisor. In that letter she told Chapman that

> it would be seen as seriously detrimental to both Chapman and the DEM-MET if it was widely known that Bond was a significant shareholder in Chapman Holdings. If investigated, it could be viewed that friendship, perhaps due to this large investment, surpassed fiduciary responsibility. Therefore, to avoid possible criticisms, we feel that the best course of action is to terminate the relationship with Bond in DEM-MET.

J.A. 722. The government questioned Sweeney about what she meant when she referred to "fiduciary responsibility" in the letter. The district court overruled Chapman's objection and allowed the inquiry to proceed. Sweeney explained that "[t]he fiduciary responsibility is the responsibility that the manager [Chapman] and the advisor [Bond] has to the pensioneers, to the participants in the pension plans and their beneficiaries." J.A. 723.

23

Chapman does not contend (nor could he) that Sweeney's letter was inadmissible.  And once the letter was admitted, it was proper for Sweeney to explain what she meant by "fiduciary responsibility."  She was not testifying as an expert, but was instead simply testifying about historical or narrative facts.  See Sinkovich, 232 F.3d at 203. The district court therefore properly rejected Chapman's claim that Sweeney's testimony was not admissible under Rule 701.

Similarly, Maria Thompson, a DEM-MET administrator, testified about her concerns when she learned that Bond had bought a large portion of the shares in Chapman Holdings.  She testified that the transaction "raise[d] a flag in my mind about ERISA of having one of our subadvisors owning part of the company," J.A. 765, which "had the appearance of conflict of interest to me."  J.A. 767. Thompson was not explaining to the jury the technical scope of a fiduciary's responsibility under ERISA or any other statute; she simply explained the reaction she had when she learned about Bond's purchase of the Chapman Holdings IPO.  Her testimony was thus properly admitted lay testimony.

Robert Rusch, an employee of Alliant Energy, which had funds being managed by DEM-MET, testified that the contract between Chapman Capital Management (which manages DEM-MET) and Alliant provided that Chapman Capital Management was a fiduciary as defined by ERISA.  When the government asked Rusch "what goes into the

24

concept of being a fiduciary," J.A. 954, Chapman objected. The district court permitted the government to question Rusch about his understanding of the contract to which his company was a party. Rusch explained that, as to the duties of a fiduciary as used in the contract, "the most important part . . . is whatever actions you take with respect to the assets of the trust, you have to make sure that whatever you do is in the best interests of the plan participants, and that is those people that are going to be receiving payments eventually out of these monies for their retirement." J.A. 956-57. This testimony was likewise properly admitted. Rusch was testifying about his personal understanding of the obligations imposed by a contract to which his company was a party, a typical and proper subject for lay witness testimony. See Ayala-Pizarro, 407 F.3d at 28.

A similar analysis applies to much of the other testimony about which Chapman complains. Lisa Foley, a DEM-MET subadvisor who participated in the eChapman IPO after pressure from Chapman, testified briefly about her understanding of the fiduciary responsibilities spelled out in the contract between her company and Chapman. Art Lynch, the Maryland Pension System's director of equities, testified about his understanding of the "prudent man rule" set out in the Pension System's investment operations manual and testified that he believed Bond's investment in eChapman violated the fiduciary obligations set forth in the operations

25

manual.  These witnesses simply testified about their personal knowledge and perceptions of the historical facts surrounding the relevant transactions.[4]  While the witnesses had particularized knowledge that they learned through their jobs, that does not convert their lay testimony into impermissible expert testimony. See Bank of China v. NBM LLC, 359 F.3d 171, 181 (2d Cir. 2004) (concluding that bank employee assigned to investigate scheme by bank customers to defraud the bank could testify about the results of his investigation:  "The fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking.  Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because

---

[4]In his brief, Chapman contends that Alan Bond's testimony about his understanding of the requirements of the prudent man rule amounted to impermissible expert testimony.  At trial, counsel for Chapman initially objected to Bond's testimony, but he quickly withdrew his objection, stating that "[w]e have no objection to him rendering what he believes this means."  J.A. 1078.  This withdrawal of the objection amounts to a waiver of any complaint about Bond's testimony, precluding us from considering the issue even under plain error review.  See United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002) (explaining that "[a] party who identifies an issue, and then explicitly withdraws it, has waived the issue," and that a waived issue "cannot be resurrected on appeal"); United States v. Masters, 118 F.3d 1524, 1526 (11th Cir. 1997) (per curiam) (declining to apply plain-error review where defendant knowingly waived objection to upward departure).

26

of the particularized knowledge that the witness has by virtue of his position in the business." (internal quotation marks and alteration omitted)); accord Ayala-Pizarro, 407 F.3d at 28.

The only challenged testimony that approaches the line between lay and expert testimony was that of Jackie Ford, a DEM-MET administrator. Ford testified that she believed Bond's investment for DEM-MET in the Chapman IPO was "a direct conflict of interest," an opinion that was "based on the fiduciary responsibilities of an investment manager." J.A. 846-47. After the district court overruled Chapman's objection, Ford elaborated:

> [A]s an investment manager, it's your responsibility to manage the portfolio for the benefit of the client, and to have one of your own instruments or company holdings into their portfolio seemed to me to be a direct conflict of interest. It doesn't seem as though you were conducting your business . . . for the benefit [of the client].

J.A. 851. Chapman objected again, and the court sustained the objection.

Assuming without deciding that Ford's testimony was impermissible expert testimony, the error in admitting her statement was harmless. See Bank of China, 359 F.3d at 183 (concluding that the improper admission of expert testimony through a lay witness is subject to harmless error review); United States v. Williams, 81 F.3d 1321, 1327 (4th Cir. 1996) (holding that error in admission of evidence is harmless if the improper evidence did not substantially influence the jury). Given the other properly-

27

admitted testimony generally describing the nature of a fiduciary's responsibilities, we cannot conclude that this limited exchange with one witness substantially influenced the jury.

B.

Chapman also contends that the district court erred by restricting the grounds upon which his expert witnesses could testify. The district court is vested with broad discretion when determining whether to limit the testimony of an expert witness. See United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994); United States v. Barsanti, 943 F.2d 428, 432 (4th Cir. 1991).

The government presented evidence indicating that it was a conflict of interest for Chapman to pressure the DEM-MET sub-advisors to participate in the eChapman IPO: Chapman Capital Management, which was controlled by Chapman, was DEM-MET's manager and primary investment advisor. Because Chapman was the majority shareholder in the companies that were combining to form eChapman and would be the majority shareholder of eChapman, Chapman personally benefitted from the purchases of eChapman stock that he pressured the DEM-MET subadvisors to make.

Chapman sought to have his expert testify that, under certain circumstances, transactions between affiliated companies are permitted under the Investment Company Act of 1940, 15 U.S.C.A. §§ 80a-1 to 80a-64 (West 1997 & Supp. 2006). Chapman wanted his expert to testify about SEC Rule 10f-3, which permits a mutual

28

fund, if certain conditions are satisfied, to purchase securities in an IPO even though the broker-dealer selling the securities is affiliated with the mutual fund advisor and the broker-dealer is a member of the IPO underwriting syndicate. See 17 C.F.R. § 270.10f-3 (2006).

The district court refused to permit this line of questioning, in part because the Investment Company Act of 1940 does not govern the relationship between Chapman Capital and DEM-MET; that relationship is instead governed by The Investment Advisors Act of 1940, 15 U.S.C.A. §§ 80b-1 to 80b-21 (West 1997 & Supp. 2006). Moreover, the district court noted that Rule 10f-3 permits the affiliated transactions only if certain conditions are met, such as the percentage of the IPO offering that will be bought by the mutual fund. Even if the rule were applicable to this case, those conditions would not have been satisfied. See J.A. 1664. Because neither the statute nor the rule about which the expert would have testified applied to the transactions at issue in this case, the proffered testimony would have served only to confuse the jury. We therefore conclude that the district court did not abuse its discretion by prohibiting this line of inquiry.[5]

---

[5]Chapman also contends that the district court erred by refusing to permit Earl Bravo to testify about the Board of Director's knowledge of Rule 10f-3, in order to demonstrate to the jury that not all affiliated transactions are impermissible. Even assuming that Bravo's testimony could be considered relevant, the district court, for the reasons explained above, was well within its discretion to exclude the testimony. See Fed. R. Evid. 403

29

Chapman also sought to present expert testimony describing the fiduciary duties of an investment manager under the contracts between Chapman Capital Management (as manager of DEM-MET) and the Maryland Pension System. To the extent that Chapman's experts would testify about whether a fiduciary duty existed, the district court noted that the legal definition of fiduciary duty would be presented to the jury through its instructions and that the testimony Chapman sought to present would therefore amount to an improper legal opinion. The court explained that it would permit Chapman, as it had the government, to present lay testimony from representatives of Chapman Capital Management to testify, as representatives of a party to the contract, about what they believed their responsibilities under the contract to be. However, the court concluded that it would intrude upon the province of the jury to allow Chapman to present what would amount to an expert opinion that Chapman did not violate the law. See J.A. 1599.

Rule 702 permits expert testimony where it is helpful to the trier of fact. See Fed. R. Evid. 702. While expert testimony is not inadmissible simply because it touches on an ultimate issue, such testimony is "excludable under Rule 702 if it does not aid the jury." United States v. Barile, 286 F.3d 749, 760 (4th Cir. 2002). "Expert testimony that merely states a legal conclusion is less

(noting that relevant evidence may be excluded if the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

30

likely to assist the jury in its determination." Id.; see also United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." (citations and internal quotation marks omitted)).

As the district court noted, the contract outlined the nature of Chapman's fiduciary duties and having an expert testify as to whether Chapman violated those duties would not be particularly helpful to the jury. See Barile, 286 F.3d at 760. Having an expert testify more generally about the existence and scope of a fiduciary duty under various (and sometimes inapplicable) securities laws could confuse the jury and usurp the district court's obligation to explain the governing law to the jury. Therefore, given the deference that we must accord a district court's determination of whether expert testimony will be helpful to the jury, we simply cannot conclude that the district court erred by excluding Chapman's proffered expert testimony.

IV.

The government's theory of the case was that Chapman needed to generate money because he was living well above his means, and the

31

government offered as evidence in this regard his improper use of the business development funds. The government bolstered its case on this issue by presenting evidence of the significant loans that Chapman took from his companies and but never repaid. Some of the loans were used to resolve personal charges that Chapman put on his company credit card. The companies paid the entire credit card bills, and charges that the bookkeeper identified as personal (such as a charge to Victoria's Secret) were treated as a receivable and placed in a "due from officer" account. Chapman never paid these charges, and at the end of the year Chapman executed promissory notes in the amount of the balance of the "due from officer" account. These loans (totaling approximately $250,000) were never approved by the Board of Directors in advance, although they typically were ratified by the Board months later.

Chapman also borrowed large amounts of money from the companies for purposes unrelated to the credit card charges. For example, he borrowed $100,000 to make a donation to a church; $45,000 to buy a Corvette for himself, and approximately $240,000 to put a down payment on his house. While Chapman executed promissory notes for these loans, the loans were not approved in advance by the Board, but were instead ratified after the fact. Chapman never made any principal or interest payments on any of the loans. Eventually, the Board rolled all of the unpaid notes into a single promissory note, payable on demand, for more than

32

$1,000,000. As of the time of trial, the Board had yet to demand payment of the note.

On appeal, Chapman contends that the district court erred by admitting evidence of the loans under Rule 404(b) of the Federal Rules of Evidence. Under Rule 404(b), evidence of uncharged crimes or other acts "is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Rule 404(b) is "a rule of inclusion, not exclusion." United States v. Smith, 441 F.3d 254, 262 (4th Cir.), cert. denied, 75 U.S.L.W. 3174 (U.S. Oct. 2, 2006). To be admissible under Rule 404(b), evidence must be "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." United States v. Wells, 163 F.3d 889, 895 (4th Cir. 1998) (internal quotation marks omitted). We have no difficulty concluding that the evidence of the loans was properly admitted under Rule 404(b).

First, the evidence was clearly relevant to the question of motive. The government contended at trial that Chapman's motive in converting the business development checks to his own use was his taste for things that he otherwise could not afford. That Chapman also "borrowed" but yet never repaid more than $1,000,000 from his companies is further evidence of his inability to live within his

means and thus of his motive to convert company funds to his own use. See United States v. Aramony, 88 F.3d 1369, 1377 (4th Cir. 1996) ("To be relevant, evidence need only to have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (internal quotation marks omitted)).

The evidence was necessary because it was probative of Chapman's motive. See United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997) (explaining that to be admissible under Rule 404(b), the challenged evidence "must be necessary in the sense that it is probative of an essential claim or an element of the offense"). Moreover, the evidence also furnishes context for the crimes with which Chapman was charged. See Smith, 441 F.3d at 262 ("Evidence is necessary, even if it does not relate to an element of a charged offense, when it furnishes part of the context of the crime." (internal quotation marks omitted)). The government's evidence showed that Chapman viewed company funds as his own. He used business development funds to help support two mistresses; he charged numerous personal expenses on company credit cards and never reimbursed the company for those charges; and he borrowed but never repaid significant amounts of money. The evidence of the unpaid loans thus helped establish Chapman's approach to the

management of his companies and helped place the crimes with which he was charged in context.

The evidence of the loans was also reliable. The promissory notes executed by Chapman were identified by company witnesses, and Chapman does not dispute their validity or amount. The evidence of the loans was thus sufficiently reliable to be admitted under Rule 404(b). See Aramony, 88 F.3d at 1378 (explaining that evidence is reliable for purposes of Rule 404(b) "unless it is so preposterous that it could not be believed by a rational and properly instructed juror"). Accordingly, we conclude that the government's evidence of the never-repaid loans satisfied the requirements of Rule 404(b).

Evidence sought to be admitted under Rule 404(b), however, must also satisfy the requirements of Rule 403: the probative value of the evidence must not be substantially outweighed by its prejudicial effect. See Fed. R. Evid. 403; Queen, 132 F.3d at 997. The loan evidence was prejudicial in the sense that it was damaging to Chapman's case. That is not the kind of prejudice, however, that warrants exclusion under Rule 403. See United States v. Hammoud, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) ("The mere fact that the evidence will damage the defendant's case is not enough--the evidence must be unfairly prejudicial, and the unfair prejudice must substantially outweigh the probative value of the evidence." (internal quotation marks omitted)), vacated on other

35

grounds, 543 U.S. 1097 (2005).  Instead, evidence should be excluded under Rule 403 if "there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and ... this risk is disproportionate to the probative value of the offered evidence."  Aramony, 88 F.3d at 1378 (internal quotation marks omitted).

The evidence presented at trial made it clear that the loans had been approved by the Board of Directors (albeit after the fact), such that there was nothing improper about the loans in and of themselves.  During its opening and closing statements, the government informed the jury that Chapman was not charged with any crimes in connection with the loans, and the government explained the limited purpose for which the jury should consider the loan evidence.  When closing argument by the government seemed to suggest that the jury could consider the loans as evidence that Chapman had breached his fiduciary duty, the district court gave a curative instruction, reminding the jury that Chapman was not charged with any crime in connection with the loans and informing the jury of the limited purposes for which the evidence was admitted.  See J.A. 2077.  Under these circumstances, we do not believe that the admission of the loan evidence created a disproportionate risk of irrational behavior on the part of the jury.  Accordingly, we find no error in the district court's decision to admit the evidence of the loans.  See Aramony, 88 F.3d

36

at 1378 ("Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly."); <u>United States v. Simpson</u>, 910 F.2d 154, 157 (4th Cir. 1990) (explaining that a district court's decision to admit evidence over a Rule 403 objection will not be overturned "except under the most extraordinary of circumstances, where that discretion has been plainly abused" (internal quotation marks omitted)).

V.

Chapman contends that the district court's instructions to the jury on the mail fraud charges were improper. According to Chapman, the court's instructions improperly suggested that breach of fiduciary duty can constitute a <u>per se</u> violation of the mail fraud statute, because the court failed to explain to the jury that the government must prove a specific intent to defraud. This argument is utterly without merit.

The part of the instruction about which Chapman complains provides that:

> [A] breach of a fiduciary duty effected in part by the use of the wires or mails may be a violation of the federal wire and mail fraud statutes, at least when the scheme is characterized also by the use of false representations or by concealment of, or failure to disclose, relevant and material facts.

37

J.A. 2033. Chapman contends this instruction was "prejudicially incomplete" because it did not mention the requisite state of mind. According to Chapman, "a reasonable juror reading this instruction could conclude that a violation of the mail and wire fraud statutes may arise from a breach of fiduciary alone, without any intent to defraud." Brief of Appellant at 53.

As the government points out, however, the <u>very next paragraph</u> of the court's instructions lists all of the elements of the charge, <u>see</u> J.A. 2034, and on the next page of the instructions the court explains that the government must prove that Chapman had the specific intent to defraud. <u>See</u> J.A. 2035. Chapman's challenge to the jury instructions therefore fails. <u>See</u> <u>United States v. Rahman</u>, 83 F.3d 89, 92 (4th Cir. 1996) ("[I]n reviewing the propriety of jury instructions, we do not view a single instruction in isolation; rather we consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law.").

## VI.

In his final challenge to his convictions, Chapman contends that various actions by the government before and during trial amount to prosecutorial misconduct that requires dismissal of the indictment.

A.

The pre-trial conduct about which Chapman complains involves the conduct of United States Attorney Thomas DiBiagio when obtaining the indictment and the conduct of the FBI when investigating the case. Chapman, who was active in Democratic Party politics, contends that he was the victim of a partisan political witch hunt by DiBiagio, a Republican appointee.[6] Chapman also complains that DiBiagio obtained the indictment by presenting his own "testimony" to the grand jury in the form of leading questions.

As to the conduct of the FBI, Chapman claims that an FBI agent aggressively questioned a Democratic political strategist about Chapman and Chapman's relationship with former Maryland Governor Paris Glendening. Chapman contends that the agent told the strategist that Chapman "was going down," and the agent asked the strategist to become an informant and told him that he could be paid for information provided. When the strategist declined the offer, the agent then offered to provide him with unfavorable information about Republican candidates.

_____

[6]In the summer of 2004 (around the time of Chapman's trial), newspapers reported that DiBiagio had been pushing his staff to make three "front page" white collar, public corruption cases by early November, just days after the 2004 general election. J.A. 2091. DiBiagio was formally rebuked by the Attorney General and was ordered not to seek further public corruption indictments without approval from the Deputy Attorney General. DiBiagio resigned in December 2004.

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988). Once a defendant is convicted by a jury after trial, "any error in the grand jury proceeding connected with the charging decision [is deemed] harmless beyond a reasonable doubt." United States v. Mechanik, 475 U.S. 66, 70 (1986).

Because Chapman was convicted by the petit jury, Mechanik would seem to foreclose his claim that the indictment must be dismissed because of misconduct before the grand jury. In other cases where such a claim is made after a guilty verdict, however, we have gone on to consider whether the prosecutorial misconduct "substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." United States v. McDonald, 61 F.3d 248, 253 (4th Cir. 1995) (internal quotation marks omitted), overruled on other grounds by United States v. Wilson, 205 F.3d 720 (4th Cir. 2000) (en banc). In our view, Chapman's claims fall far short of satisfying these standards.

The decision to seek an indictment is one that is entrusted to the sound discretion of the prosecutor, and a "presumption of regularity supports their prosecutorial decisions." United States v. Armstrong, 517 U.S. 456, 464 (1996) (internal quotation marks omitted). That presumption may be overcome, however, by "clear

evidence" that the prosecutor's decision was driven by a constitutionally impermissible motive such as "race, religion, or other arbitrary classification." Id. The evidence that DiBiagio was actively seeking out public corruption cases does not amount to sufficiently clear evidence that DiBiagio's decision to seek the indictment was the product of a constitutionally impermissible motive.

As to Chapman's contention that DiBiagio engaged in misconduct before the grand jury, Chapman does not dispute the government's contention that DiBiagio did not appear before the grand jury that returned the superseding indictments in this case, nor is there any indication that the grand jury that returned the superceding indictment was ever presented with transcripts of any grand jury examinations by DiBiagio. Under these circumstances, we cannot conclude that Chapman was prejudiced by any misconduct by DiBiagio in the handling of the initial grand jury proceeding. See United States v. Feurtado, 191 F.3d 420, 425 (4th Cir. 1999) (concluding that district court properly denied motion to quash indictment where misleading grand jury testimony was not presented to the grand jury that handed down a superseding indictment).

As to the conduct of the FBI, we will assume for purposes of this opinion that the FBI's alleged heavy-handed tactics occurred when questioning the political strategist and were improper. Chapman, however, has not even attempted to demonstrate how that

41

conduct influenced the grand jury's decision to indict.  Chapman

does not contend that the witness testified before the grand jury

or that his statements were otherwise presented to the grand jury.

Because Chapman has not established that the FBI misconduct had any

bearing on the grand jury's decision to indict, the mere existence

of that misconduct does not warrant dismissal of the indictment.[7]

See United States v. Lee, 906 F.2d 117, 120 (4th Cir. 1990) (per

curiam) ("[A]s the Supreme Court has explained, absent demonstrable

---

[7]When setting out of the facts of this case in his brief, Chapman notes that DiBiagio himself ran roughshod over witnesses, offering some witnesses preferential treatment by not prosecuting them if they cooperated with him, but prosecuting a witness who reluctantly testified for the government, and by promising one witness (a state employee) that her job would be protected as long as she cooperated with him.  However, in the argument section of Chapman's brief where Chapman contends that the indictment should be quashed on grounds of prosecutorial misconduct, Chapman makes no mention of DiBiagio's treatment of these witnesses.  Because Chapman makes no argument as to why the treatment of these witnesses might warrant dismissal of the indictment, we decline to consider that issue sua sponte.  See Fed. R. App. P. 28(a)(9)(A) (requiring argument section of brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); cf. United States v. Williams, 461 F.3d 441, 448 n.3 (4th Cir. 2006) ("Although Williams references the Self-Incrimination Clause at various places in his brief, he neither argues nor cites any authority for the proposition that the district court's ruling conditioning the admissibility of the demonstration on his willingness to take the stand 'compelled [him] to be a witness against himself' in violation of the Self-Incrimination Clause. We therefore do not consider the argument."); United States v. Hammoud, 381 F.3d 316, 334 n.7 (4th Cir. 2004) (en banc) ("Hammoud suggests that the FBI should have abandoned the surveillance when it became clear that no foreign intelligence information would be obtained. Hammoud provides no argument supporting this claim, however, and we therefore do not consider it."), vacated on other grounds, 543 U.S. 1097 (2005).

prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." (internal quotation marks omitted)).

B.

Chapman also contends that various actions of the government at trial amount to misconduct severe enough, when considered cumulatively, to require dismissal of the indictment. Specifically, Chapman contends that dismissal of the indictment is warranted because (1) the government wrongfully withheld evidence that should have been turned over to Chapman under Brady v. Maryland, 373 U.S. 83 (1963); (2) the government systematically excluded black women from the jury; (3) the government referred to Earl Bravo, a defense witness and former president of Chapman Capital Management and Chapman board member, as a "co-schemer"; (4) the government improperly presented evidence of the loans to Chapman from his companies; and (5) the government improperly vouched for its witnesses and made other improper statements during closing argument.

"In reviewing a claim of prosecutorial misconduct, we review the claim to determine whether the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." United States v. Scheetz, 293 F.3d 175, 185 (4th Cir. 2002) (internal quotation marks omitted). Generally, cases involving prosecutorial misconduct occurring during trial are

remedied by the granting of a new trial, but that relief is warranted only in "the most egregious cases." United States v. Dudley, 941 F.2d 260, 264 (4th Cir. 1991). Chapman cites no case where the significantly more drastic remedy of dismissing the indictment was found to be a proper remedy for prosecutorial misconduct occurring during trial. See United States v. Derrick, 163 F.3d 799, 807 (4th Cir. 1998) ("The dismissal of an indictment altogether clearly thwarts the public's interest in the enforcement of its criminal laws in an even more profound and lasting way than the requirement of a retrial."). Assuming that such a remedy would ever be appropriate, it seems clear that the conduct warranting a dismissal of the indictment would need to be substantially more egregious than conduct that would warrant the granting of a new trial. We have no difficulty concluding that the alleged misconduct at issue here was not sufficiently egregious to warrant dismissal of the indictment.

We have already concluded that the evidence of the loans was properly admitted and that Chapman failed to establish any error in the selection of the jury. Because there was no error associated with those claims, we will not consider them further.

The Brady material that Chapman contends was withheld by the government were the exhibits used in Alan Bond's "cherry-picking" trial. Although Chapman did not receive the exhibits before the trial started, he did receive them more than a month before Bond

testified. To the extent that the government should have provided the material earlier, Chapman still had sufficient time to examine the documents, and Chapman therefore was not prejudiced by the delay.

As to Earl Bravo, the government on one occasion described Bravo, one of Chapman's principal deputies at the Chapman companies, as a "co-schemer" on the various fraud charges when seeking to admit a statement made by Bravo. See Fed. R. Evid. 801(d)(2)(E) (defining as not hearsay "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy"). The district court sustained Chapman's objection to the line of questioning, struck the reference to "co-schemer," and gave the jury a curative instruction the next day. Chapman thus was not prejudiced by the single reference to Bravo as a co-schemer.

Finally, we consider Chapman's contention that the government made improper and prejudicial statements during its rebuttal closing argument. Because Chapman failed to object to the statements when they were made, our review is for plain error only.

The government's statement that it had been an "incredible privilege" to meet some of the witnesses did not amount to the government vouching for those witnesses. See, e.g., United States v. Collins, 415 F.3d 304, 307 (4th Cir. 2005) (explaining that a prosecutor improperly vouches for a witness if the prosecutor

indicates his personal belief in the witness or indicates to the jury that he can guarantee the truthfulness of a witness).  And the government statement that the arguments of Chapman's attorney "pain me personally" was nothing more than an innocuous response to various statements made in Chapman's closing.[8]  Accordingly, these statements were not improper.

The prosecutor's statements about his duty to seek justice and to "make sure that the burden of punishment never falls on people when it is not appropriate," J.A. 1974, are the only comments that are even arguably improper.  See, e.g., United States v. Higgs, 353 F.3d 281, 332 (4th Cir. 2003) ("As a general premise, a prosecutor's repeated references to his or her personal opinion about a defendant may indeed be found improper.").  Even if we assume, however, that this argument was improper, we find no prejudice.  The argument was but a small part of the government's lengthy closing and rebuttal arguments, and was, at most, just over the edge of propriety.  It is thus "unlikely that [the argument] had any measurable tendency to mislead the jury, nor does it appear that the prosecutor had any intention to divert the attention of the jury."  Smith, 441 F.3d at 265.  Under these circumstances, we cannot conclude that the argument was so plainly prejudicial as to require us to notice and correct the error on plain error review.

---

[8]For example, counsel for Chapman argued that the government was "being dishonest" with the jury, J.A. 1933, and that the government had "ruined a lot of lives."  J.A. 1947.

46

Accordingly, we conclude that none of the specific instances of "misconduct" identified by Chapman amount to reversible error. Errors that do not warrant reversal individually, however, can warrant reversal when the cumulative effect of the errors is considered. See United States v. Martinez, 277 F.3d 517, 532 (4th Cir. 2002) ("Under the 'cumulative error doctrine,' Martinez can satisfy the requirements of the third prong of Olano if the combined effect of the two Rule 11 errors affected his substantial rights, even if individually neither error is sufficiently prejudicial."). But because we have identified, at most, only one error, the cumulative error doctrine has no application to this case. Chapman's motion to dismiss the indictment on grounds of prosecutorial misconduct was thus properly denied.

VII.

Chapman contends that his sentence was imposed in violation of the principles set forth in United States v. Booker, 543 U.S. 220 (2005). We agree.

A.

Chapman was tried after the Supreme Court issued its decision in Blakely v. Washington, 542 U.S. 296 (2004), but before the issuance of our opinion in United States v. Hammoud, 381 F.3d 316 (4th Cir. 2004) (en banc), and the Supreme Court's opinion in Booker. Anticipating that Blakely might lead to the invalidation of the Sentencing Guidelines, the district court submitted certain

47

sentencing interrogatories to the jury. Answering the interrogatories, the jury concluded that the amount of loss caused by the eChapman IPO charges was $5,000,856.00,[9] and that Chapman abused a position of trust with regard to the eChapman fraud scheme.

At sentencing (which took place after <u>Hammoud</u> but still before <u>Booker</u>), the district court used the loss amount determined by the jury to add an 18-level enhancement to the base offense level established by the Guidelines. The court also applied a two-level enhancement based on the jury's determination that Chapman abused a position of trust. The district court then applied other enhancements as recommended in the presentence investigation report--an enhancement for role in the offense and obstruction of justice--to arrive at a total offense level of 32 and a Guideline sentencing range of 121-151 months. The district court then departed downward three levels, which yielded a Guideline sentencing range of 87-108 months. The district court sentenced Chapman to 90 months.

B.

There are two types of <u>Booker</u> sentencing errors -- Sixth Amendment errors and statutory errors. A Sixth Amendment error "occurs if a sentencing court enhances a sentence beyond the

---

[9]The jury was unable to reach a unanimous decision on the amount of loss caused by charges involving the business development funds.

48

maximum authorized by facts found by a jury beyond a reasonable doubt or admitted by the defendant." United States v. Williams, 445 F.3d 724, 741 (4th Cir.) (internal quotation marks omitted), cert. denied, 75 U.S.L.W. 3174 (U.S. Oct. 2, 2006). A statutory error "occurs if the sentencing court treats the Guidelines as mandatory, rather than as advisory." Id. (internal quotation marks omitted). We agree with Chapman that a Sixth Amendment error occurred in this case.

The Guidelines establish a base offense level of six for Chapman's convictions. See U.S.S.G. § 2B1.1(a)(2). Adding to that the 18-level loss amount enhancement and the two-level abuse of position of trust enhancement authorized by the jury's answers to the special interrogatories, the highest offense level supported by the jury's findings is 26. With Chapman's category I criminal history, the maximum sentence authorized by the jury's findings was 63-78 months. Because the 90-month sentence imposed by the district court exceeded that range, the district court's application of the role in the offense and obstruction of justice enhancements violated Chapman's Sixth Amendment rights.

The government, however, contends that the two-level obstruction of justice enhancement was properly applied. The jury convicted Chapman on a charge of lying to the SEC in a letter, and lying to the SEC in the letter was one of the grounds for the obstruction enhancement. The government therefore argues that the

49

obstruction enhancement was based on facts alleged in the indictment and found beyond a reasonable doubt by the jury. Because the 90-month sentence imposed is within the Guidelines sentencing range for an offense level of 28, the government argues that no Sixth Amendment violation occurred.

While this argument has superficial appeal, it is foreclosed by our decision in United States v. Hughes, 401 F.3d 540 (4th Cir. 2005). In Hughes, the defendant was convicted of several counts of bankruptcy fraud based on statements he made in various schedules he filed with the bankruptcy court and two counts of perjury based on false testimony given while under oath during bankruptcy proceedings. At sentencing the district court grouped the convictions and imposed a sentence for the bankruptcy fraud charges; no independent sentence was imposed for the perjury charges. To account for the perjury convictions, however, the district court imposed a two-level obstruction of justice enhancement, based on the false testimony before the bankruptcy court. See id. at 558. The district court at sentencing also applied several other fact-based enhancements to the defendant's sentence. See id. at 544.

When considering the Booker issue on appeal, the Hughes court found Sixth Amendment error because the defendant's sentence was increased beyond what he would have received based only on the facts as found by the jury. The Hughes court stated that, with one

exception (an enhancement for an offense occurring during bankruptcy proceedings), all of the enhancements to the sentence "were based upon facts found by the district court, not by the jury." See id. at 544 & n.3.

Just as lying to the SEC is conduct that would support an obstruction of justice enhancement under the Guidelines, the perjury for which the defendant in Hughes was convicted would likewise support an obstruction of justice enhancement. By concluding that all of the enhancements (save one not relevant to this analysis) that were applied in Hughes were based on facts not found by the jury, the Hughes court implicitly rejected the very argument made by the government in this case. Accordingly, we are constrained by Hughes to reject the Government's argument that the obstruction of justice enhancement was proper under Booker. We therefore vacate Chapman's sentence and remand for re-sentencing.

VIII.

The district court ordered Chapman to pay $5,000,856.00 in restitution, the loss amount found by the jury, to two DEM-MET clients--Alliant Energy and the Maryland Pension System. Chapman raises several challenges to the restitution ordered by the district court. Because these issues are raised for the first time on appeal, we review them for plain error only.

Chapman first contends that it was error for the district court to adopt the loss amount found by the jury. Chapman contends

51

that it was error to submit the loss amount question to the jury, and that the error was compounded when the district court adopted the loss amount found by the jury.

Even assuming that it was error, during the uncertain time between <u>Blakely</u> and <u>Booker</u>, to submit the loss-amount question to the jury, Chapman fails to explain how he was prejudiced by the issue being decided by the jury rather than the district court. Moreover, although the district court ordered restitution in the same amount as found by the jury, the court gave no indication that it considered itself bound by the jury's finding. Thus, if the district court had perceived a problem with the loss amount determined by the jury, we have no reason to believe that the court would not have made its own determination of the loss amount. And because the amount of restitution ordered by the court is within the range supported by the evidence presented at trial (and was in fact substantially less than the loss amount sought by the government), we fail to see how Chapman was prejudiced by the manner in which the court arrived at the amount of the restitution award.[10]

---

[10]Chapman also asserts in a single sentence that the district court failed to observe the procedures for determining the amount of restitution set forth in 18 U.S.C.A. §§ 3663A & 3664. Because Chapman makes no argument on this point and does not even mention the procedures that he believes the district court failed to follow, we decline to consider the issue. <u>See</u> Fed. R. App. P. 28(a)(9)(A); <u>Williams</u>, 461 F.3d at 448 n.3.

Chapman also contends that the district court should have determined whether the victims have already been compensated for their losses through the restitution that has been paid by Alan Bond in connection with the cherry-picking charges. This argument is without merit. Bond was involved in two crimes that happened to cause losses to DEM-MET's clients--the cherry-picking scheme and the eChapman IPO scheme. The crimes, however, were unrelated, and they inflicted distinct and unrelated sets of losses on the DEM-MET clients. There is no reason why Chapman's restitution obligation should be offset by restitution paid by another criminal for an unrelated crime that happened to inflict unrelated financial losses on the victims of Chapman's crimes.

Under these circumstances, we decline to exercise our discretion to notice any errors that might have been associated with the district court's restitution order.

IX.

Accordingly, for the foregoing reasons, we affirm Chapman's convictions and the restitution order. However, we vacate Chapman's sentence and remand for re-sentencing.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED

53