**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Plaintiff–Appellee,**

v.

**Thomas C. SINKOVICH, Defendant– Appellant.**

**No. 97–2634.**

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 28, 1998

Decided: Nov. 2, 2000

**ARGUED:** Daniel Mark Press, Chung & Press, P.C., McLean, Virginia, for Appellant. Steven Eric Goldman, Goldman & Hellman, P.A., New York, New York, for Appellee.

Before WIDENER and WILKINS, Circuit Judges, and ANDERSON, United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

WIDENER, Circuit Judge:

Plaintiff, Certain Underwriters at Lloyd's, London (Underwriters), brought this case for declaratory relief pursuant to 28 U.S.C. § 2201 *et seq.* against defendant, Thomas C. Sinkovich, for resolution of a dispute involving Underwriters's hull insurance policy for Sinkovich's yacht. The district court found that Sinkovich did not fulfill the policy's terms and held that Underwriters was not obligated to pay Sinkovich the insurance proceeds. For the reasons stated below, we vacate the district court's judgment and remand this case for a new trial.

On the morning of August 1, 1995, Sinkovich set sail from Puerto Azul, Venezuela with his fiancee. While sailing on a compass course set for approximately 84

degrees on autopilot, Sinkovich felt an unknown thump to his boat. Sinkovich testified that although he was not positive as to his location at the time of the incident, he was probably less than a mile offshore.

After feeling the thump, Sinkovich disengaged the autopilot and attempted to steer as the boat veered off course to the right. The steering mechanism, however, was locked, and he shifted the engine to neutral. Sinkovich proceeded to inspect the boat from topside to determine whether the boat had hit something or if he could detect a problem. He then went below decks to see if the boat was taking on water, and the interior of none of the compartments showed visible signs of water. He returned to the helm to attempt to steer the boat, at which time the boat struck submerged rocks that were an estimated 300–400 yards offshore. Sinkovich testified that he estimated 20 or 25 minutes elapsed from the time that he felt the thump to when he struck the rocks.

After learning of Sinkovich's accident, Underwriters hired Edwin S. Geary, a marine surveyor and investigator, to investigate the accident and the facts and circumstances surrounding the incident. Geary compiled a comprehensive file of several hundred pages regarding the incident. In preparing the report, Geary investigated the wreckage and interviewed Sinkovich, his fiancee, and other people with information concerning the wreck. The Joint Appendix describes the papers involved as Edward Geary's File and Trial Exhibit 3. The file was admitted into evidence as a business record and consists of 343 pages.

Underwriters's policy for Sinkovich's boat contains what is called a sue and labor clause that provides: "in the event of a loss" the insured must "immediately take all possible steps to minimize the loss and protect the property from further loss. Failure to do so may invalidate your insurance coverage or reduce the amount of any claims thereunder." The district court's proceedings accordingly were concerned with whether a "loss" occurred at the time when Sinkovich felt the thump to his yacht and lost steering, thus triggering the sue and labor clause and Sinkovich's duty to take steps to minimize further loss.

During discovery, Sinkovich properly requested that Underwriters identify all expert witnesses in accordance with Fed. R.Civ.P. 26(a)(2) and (b)(4) and disclose any documents related to experts, as well as documents related to the facts of the case. Underwriters did not list Geary as an expert nor reveal his substantial report or file concerning the incident. Accordingly, at trial the district court stated that it would limit Geary's testimony to what he observed but nothing beyond lay knowledge. Cf. Fed.R.Evid. 701. Sinkovich argues that despite the court's limitation on Geary's testimony, the court admitted several statements from him regarding the vessel and conditions surrounding the accident that only an expert could make. He also argues that the district court erroneously admitted Geary's investigative report under the business record exception to the hearsay rule.

At the conclusion of the bench trial, the district court found that the thump to Sinkovich's boat caused a loss under the sue and labor clause and triggered Sinkovich's duty to minimize further damage. The court further found that Sinkovich did not take reasonable steps to avoid increased damage to the boat and held that Underwriters was not liable under the policy because Sinkovich failed to comply with the requirements of the sue and labor clause. The district court denied Sinkovich's motions to amend the judgment or for a new trial, and Sinkovich appealed.

We hold that the district court erred in admitting improper expert testimony from Geary, a lay witness, and by admitting Geary's investigative report under the business record exception. Accordingly, we vacate the judgment of the district court and remand this case for a new trial.

We first address the district court's admission of Geary's testimony as a lay wit-

ness. The district court ruled that in light of Underwriters failure to identify Geary as an expert during discovery, the court would limit Geary's testimony to that of a lay witness. Sinkovich argues that despite this ruling, the court repeatedly admitted testimony from Geary that only an expert was capable of delivering. Therefore, he argues that Geary's testimony was inadmissible.

Fed.R.Evid. 702 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 701, however, is limited to situations where a witness is "not testifying as an expert." It provides that a lay witness can give an opinion if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

■ Rule 701 permits lay witnesses to "offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived." *MCI Telecomms. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir.1990) (quoting *Teen–Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980)). This rule, however, generally does "not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir.1979). A critical distinction between Rule 701 and Rule 702 testimony is that an expert witness "must possess some specialized knowledge or skill or education that is not in the possession of the jurors." Redden & Saltzburg, *Federal Rules of Evidence Manual* 225 (1975). Unlike a lay witness under Rule 701, an expert can answer hypothetical questions and offer opinions not based on first-hand knowl-

edge because his opinions presumably "will have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ Although the district court indicated it would limit Geary's testimony to that of a lay witness, much of his testimony was in the form of responses to hypothetical or like questions that required specialized knowledge to answer. For example: over Sinkovich's objections, the district court admitted Geary's responses to these hypothetical questions: "Would the anchor depicted in the photograph have held on that bottom?"; "Would the same [referring to holding] be true if any of the other three anchors had been released?"; "Would an anchor, had it been thrown overboard by you or by Mr. Sinkovich or anybody, taken hold and prevented the vessel from drifting in to shore to scrape on rocks?"; "How long would it have taken you to have utilized any one of those anchors after hearing the thump described by Mr. Sinkovich?"; "How long would it have taken you to have freed that dingy?"; "And, again, based on your own navigation in this area, your own experiences, how long would it have taken a vessel to drift in from a mile to a mile and a half?"; "Based on your own experience, if you had been further offshore than a mile or a mile and a half, if you had been two or three miles, it would have taken even longer to drift in[?]." Such questions require specialized knowledge and calculations of an expert, not a lay, witness regarding the vessel's size and location; the condition of the bottom at a particular location; the wind and current conditions at the time of the accident and their effect on the particular vessel; whether the anchors at hand would hold in the bottom under the vessel, etc. For an example of the expert knowledge of the seaman, see *Knight's Modern Seamanship*, 10th Ed. (1941).

Geary did not have any first-hand knowledge of the accident nor were his conclusions ones that a normal person would form based upon his perceptions. Geary's sole basis of knowledge concerning the accident derived from his investigation and his analysis of the data he collected. He did not see the accident; nor did he have personal knowledge of the vessel's location, the bottom conditions of that location, or the wind, wave, and current conditions at the time of the accident. As a lay, not expert, witness, he lacked the personal knowledge necessary to express the opinions that he did. Furthermore, his answers as to the effectiveness of dropping anchor, the location of the vessel, and the time interval between the thump and the grounding exceed the scope of common experience. Such conclusions could only be drawn by an experienced seaman or marine engineer. Despite its failure to sustain Sinkovich's objections to Geary's testimony, the district court even recognized that Geary was testifying as to "the application of the art and science of navigation" and that the average citizen could not reach a certain conclusion of Geary upon application of the facts at hand. We hold that the district court erred in admitting Geary's testimony, as mentioned, and like testimony, as lay testimony in this case, even under Rule 701.

Sinkovich also argues that the district court abused its discretion by admitting Geary's investigative report of the accident as a business record under Fed.R.Evid. 803(6).[1] Sinkovich maintains that Geary's incident report lacks the requisite indicia of reliability and trustworthiness that are necessary for the business record exception to apply because the report was not made in the ordinary course of business, but instead, it was compiled with an eye towards litigation.[2]

Reports and documents prepared in the ordinary course of business are generally

1. Rule 803(6) provides as an exception to the hearsay rule: "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."

2. The report of Geary admitted into evidence by the district court and described in the Appendix as "Trial Exhibit 3, Edward Geary's File" consists of 343 pages of documents of every description with respect to the wreck and includes, for example, such papers as a letter to the insurance company's attorney of some 13 pages, which is an item-by-item critique and criticism of a deposition of Sinkovich, with the disagreement of Geary to much of that deposition; another letter from Geary to the insurance company's attorney containing the factual and legal conclusions that "... the loss of the yacht PALS I, the failure of the insured to avert the grounding, failure to attempt to mitigate the damages after the grounding, failure to act as a prudent uninsured, and failure to advise Underwriters as soon as possible of the loss are considered to be a clear breach and violation of the terms and conditions of the policy as specified under *11. Your Duties in the Event of a Loss;*" and a letter to a Miss DiGennaro, an employee of the insurance company, which contained, among other things, the comment that "... Mr. Sinkovich is basically a nice chap, but I think he may be undergoing a delayed identity crisis in his life which may be affecting his judgment. He has a 20–year old ... girlfriend who he explained has no education and therefore he should possibly prepare her statement."

We have not attempted to list all the papers in the report, but the few items just mentioned illustrate the reason that such documents as this, prepared in view of litigation, are not admissible as business records under Rule 803(6) and illustrate the often-quoted words of Judge Jerome Frank, in *Hoffman v. Palmer,* 129 F.2d 976, 991 (2d Cir.1942), that such documents prepared specifically for use in litigation are "dripping with motivations to misrepresent."

We cast no reflection on Geary for the letters from him to his employer. Admitting his file into evidence, however, is simply not to be permitted.

presumed to be reliable and trustworthy for two reasons: "First, businesses depend on such records to conduct their own affairs; accordingly, the employees who generate them have a strong motive to be accurate and none to be deceitful. Second, routine and habitual patterns of creation lend reliability to business records." *United States v. Blackburn,* 992 F.2d 666, 670 (7th Cir.1993) (citing *United States v. Rich,* 580 F.2d 929, 938 (9th Cir.1978)). The absence of trustworthiness is clear, however, when a report is prepared in the anticipation of litigation because the document is not for the systematic conduct and operations of the enterprise but for the primary purpose of litigating. As *Blackburn,* 992 F.2d at 670, points out, the Advisory Committee's notes in § 803(6) provide in terms: "[a]bsence of routine raises lack of motivation to be accurate." See also *Palmer v. Hoffman,* 318 U.S. 109, 114, 63 S.Ct. 477, 87 L.Ed. 645 (1943);[3] *Scheerer v. Hardee's Food Sys. Inc.,* 92 F.3d 702, 706–07 (8th Cir.1996) (stating that a report lacks trustworthiness because it was made with knowledge that incident could result in litigation).

■ It was undisputed that Underwriters hired Geary to prepare the report specifically for this case. This admission reveals Underwriters's motivation for having the report prepared and precludes it from relying on the business record exception. Underwriters, however, argues that the prohibition against admitting records prepared in anticipation of litigation under the business record exception does not apply here because Underwriters, itself, did not prepare the report. Rather, it contracted an outside investigator (Geary) to prepare the report, and Geary regularly prepares and maintains a file of such reports as part of his ordinary course of investigating. We find this argument unpersuasive.

The report is no more trustworthy because Geary prepared it than if Underwriters had done so. Whether Underwriters compiled the report as part of an internal investigation with in-house employees or whether Underwriters hired an outside investigator to prepare the report, the conclusion remains that the primary motive for initially preparing the report was to prepare for litigation. See *Blackburn,* 992 F.2d at 670 (stating that report prepared by lenscrafter at the FBI's request and with knowledge that any information it supplied would be used in ongoing investigation was not prepared or kept in the ordinary course of the lenscrafter's business). Litigants cannot evade the trustworthiness requirement of Rule 803(6) by simply hiring an outside party to investigate an accident and then arguing that the report is a business record because the investigator regularly prepares such reports as part of his business. If that were the case, parties that face litigious situations could always hire such nonaffiliated firms and investigators to prepare a report and then seek to admit the document over hearsay objection. The primary motive for preparing the report in the first place is a better indicator of trustworthiness than the form of the investigation or the identity of the investigator.[4]

We conclude that the district court erred by admitting expert testimony from Geary as a lay witness and by admitting Geary's

---

3. *Palmer* was decided under what is sometimes called the Business Records Act then in effect, 28 U.S.C. § 695, which was not different in any respect pertinent here from § 803(6).

4. *Blackburn,* 992 F.2d at 670, relates, and we agree, that the rule is well established that documents made in anticipation of litigation are inadmissible under the business records exception. See also: *Lamb Eng'g. and Constr. Co. v. Nebraska Public Power Dist.,* 103 F.3d 1422 (8th Cir.1997); *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.,* 896 F.2d 1035 (7th Cir.1990); *Noble v. Alabama Dept. of Envtl. Mgmt.,* 872 F.2d 361 (11th Cir.1989); *Broad. Music, Inc. v. Xanthas, Inc.,* 855 F.2d 233 (5th Cir.1988).

report as a business record under Rule 803(6). In so doing, it abused its discretion.

Accordingly, the judgment of the district court must be vacated and the case remanded for a new trial.

*VACATED AND REMANDED FOR A NEW TRIAL*