In re NETTEL CORPORATION,
Inc., et al., Debtors.

Wendell W. Webster, Trustee, Plaintiff,

v.

Fujitsu Consulting, Inc., Defendant.

Bankruptcy No. 00–01771.
Adversary No. 02–10122.

United States Bankruptcy Court,
District of Columbia.

May 22, 2007.

Linda M. Correia, Webster, Fredrickson, & Brackshaw, Washington, DC, for Plaintiff.

Kevin R. McCarthy, William D. White, McCarthy & White, PLLC, McLean, VA, for Defendant.

*MEMORANDUM DECISION REGARDING THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT AND FUJITSU'S CROSS–MOTION FOR SUMMARY JUDGMENT*

S. MARTIN TEEL, JR., Bankruptcy Judge.

Wendell W. Webster is the trustee in the case under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, of the debtor NETtel Corporation, Inc. ("NETtel"). He initiated this adversary proceeding to avoid and recover two transfers made by NETtel to DMR Consulting, Inc. ("DMR"), a company now known as Fujitsu Consulting, Inc. ("Fujitsu"), pursuant to 11 U.S.C. §§ 547 and 550. The court will deny Webster's motion for summary judgment and grant Fujitsu's cross-motion for summary judgment.[1]

## I

### FACTUAL AND PROCEDURAL HISTORY

NETtel filed its petition under chapter 11 of the Bankruptcy Code on September 28, 2000. On October 23, 2000, this court converted NETtel's case to chapter 7. Webster subsequently became the trustee in the case.

Sometime in or around September of 1999, NETtel engaged DMR to provide NETtel consulting services to help develop and integrate NETtel's information technology ("IT") systems. (Erickson Decl. at Ex. C.) DMR placed numerous consultants on-site at NETtel for this purpose. Until mid-December 1999, DMR issued approximately six invoices, five of which were for less than $5,000. Thereafter, DMR issued many more invoices. (Erickson Decl. at Ex. C.) NETtel never made any of its

1. The court considered the following documents in rendering this memorandum decision: the Trustee's Motion for Summary Judgment and Memorandum of Points and Authorities in Support of Trustee's Motion for Summary Judgment and Exhibits 1–11 thereto (D.E. No. 31, filed Sept. 12, 2003) (the "Pl. Mot." and "Pl. Mem.," respectively); the Statement of Material Facts Not in Dispute (D.E. No. 32, filed Sept. 12, 2003) (the "Pl. Stmt. of Facts"); Fujitsu Consulting's Opposition to Trustee's Motion for Summary Judgment and Cross–Motion for Summary Judgment (D.E. Nos. 38–39, filed Oct. 9, 2003) (the "Def. Opp./Cross Mot."); the Memorandum of Law of Fujitsu Consulting Inc. in Opposition to the Trustee's Motion for Summary Judgment and in Support of Its Cross–Motion for Summary Judgment (D.E. No. 40, filed Oct. 9, 2003) (the "Def. Mem."); Fujitsu Consulting Inc.'s Statement of Undisputed Facts (D.E. No. 41, filed Oct. 9, 2003) (the "Def. Stmt. of Facts"); the Declaration of William Barkdoll (D.E. No. 42, filed Oct. 9, 2003) (the "Barkdoll Decl."); the Declaration of Steven D. Gorelick and Exhibits A–B thereto (D.E. No. 42, filed Oct. 9, 2003) (the "Gorelick Decl."); the Declaration of Richard Erickson and Exhibits A–C thereto (D.E. Nos. 44–45, filed Oct. 9, 2003) (the "Erickson Decl."); the Trustee's Opposition to Defendant's Cross Motion for Summary Judgment and Supplemental Memorandum in Support of Trustee's Motion for Summary Judgment (D.E. No. 71, filed Jan. 16, 2004) (the "Pl. Reply"); the Reply Memorandum of Law of Fujitsu Consulting Inc. in Further Support of Its Cross–Motion for Summary Judgment and the Declaration of Steven D. Gorelick and Exhibits A–B attached thereto (D.E. No. 76, filed Feb. 3, 2004) (the "Def. Reply" and "Gorelick Decl. II," respectively); the Trustee's Supplemental Memorandum in Opposition to Defendant's Cross Motion for Summary Judgment[ ] and in Support of Trustee's Motion for Summary Judgment (D.E. No. 83, filed Nov. 16, 2006) (the "Pl. Suppl. Opp."); and Fujitsu Consulting, Inc.'s Response to Supplemental Memorandum Filed by the Trustee in Further Support of Trustee's Motion and in Opposition to Fujitsu's Cross–Motion for Summary Judgment (D.E. No. 84, filed Dec. 11, 2006) (the "Def. Suppl. Reply").

payments within thirty days of receipt of the invoices as required by the terms of the parties' contract. (Erickson Decl. at Ex. C.)

NETtel's operations were substantially funded throughout the latter part of 1999 by a large infusion of working capital received in the summer of 1999. (Barkdoll Decl. ¶ 5.) By early 2000, NETtel's cash position had worsened and its accounts payable to vendors and creditors was increasing and aging. (Barkdoll Decl. ¶ 5.) By February of 2000, NETtel was paying only a portion of its bills. (Barkdoll Decl. ¶ 5.) At the same time, NETtel was attempting to launch an initial public offering ("IPO") targeted for March of 2000. (Barkdoll Decl. ¶ 7.) When vendors sought assurances related to the prospect of payment of their invoices, NETtel's routine response in early 2000 was to ask the vendors to be patient and to indicate that NETtel was expecting a substantial infusion of working capital from its IPO, at which time NETtel would be in a position to make substantial payments to its vendors. (Barkdoll Decl. ¶ 7.) Ultimately, NETtel determined that it would be unable to consummate the contemplated IPO due to a general downturn in the market. (Barkdoll Decl. ¶ 8.) NETtel intensified its efforts to raise working capital from other sources, including loans and cash calls to its investors. (Barkdoll Decl. ¶ 8.) In early April of 2000, NETtel received an infusion of approximately $6 million from Nortel Networks, Inc. (Barkdoll Decl. ¶¶ 9–13.) The loan enabled NETtel to make significant payments to its vendors, including DMR. (Barkdoll Decl. ¶¶ 11–13.) On or about April 20, 2000, NETtel received an infusion of approximately $10 million from a private placement in which NETtel issued shares of preferred stock to a group of investors. (Barkdoll Decl. ¶ 10.) This infusion enabled NETtel to make another round of payments to its vendors, including DMR. (Barkdoll Decl. ¶ 13.) An additional infusion of $1.5 million in May or June contributed to smaller payments to NETtel's vendors. (Barkdoll Decl. ¶¶ 16–17.)

Finally, NETtel received a $14 million cash infusion in July of 2000. (Barkdoll Decl. ¶ 19.) The company received another $10 million in August of that same year. (Barkdoll Decl. ¶ 22.) These infusions resulted in payments, respectively, of $1,000,001.00 (on July 17, 2000) and $602,693.00 (on August 14, 2000) to DMR. (Barkdoll Decl. ¶¶ 20, 23; Erickson Decl. at Ex. C.) Webster seeks to avoid these last two payments as preferential transfers under 11 U.S.C. § 547, and, upon the transfers being avoided, he seeks recovery of the amounts transferred under 11 U.S.C. § 550.

## II

### LEGAL STANDARD

Both Webster and Fujitsu have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (as incorporated by Fed. R. Bankr.P. 7056). Under this rule, judgment may be granted in one party's favor if the moving party can show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court must deny summary judgment where there is a genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the movant makes a properly supported motion, the burden shifts to the opposing party to demonstrate specific facts showing that there is a genuine issue for trial. *Id.*

If the moving party does not bear the burden of proof at trial on an issue, summary judgment may be granted if the moving party shows "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant alleges that the opposing party lacks proof to establish requisite elements of its case, the movant must show the absence of such facts. *Id.* The court must view the opposing party's evidence in a light most favorable to nonmovant's position and draw inferences in favor of that party, provided such inferences are justifiable or reasonable. *Matsushita Elec. Indus. Co., Inc. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Fujitsu does not contest that Webster's evidence satisfies the requirements for avoidance of the challenged transfers under 11 U.S.C. § 547(b). Rather, it argues that there is no genuine dispute of material fact with respect to its "ordinary course of business" defense raised under 11 U.S.C. § 547(c)(2) and its alternative "new value" defense raised under 11 U.S.C. § 547(c)(4). Fujitsu bears the burden of proof with respect to each of these defenses. 11 U.S.C. § 547(g).

## III

## "ORDINARY COURSE OF BUSINESS" DEFENSE

■ Fujitsu argues that the two payments at issue here were made in the "ordinary course of business" pursuant to 11 U.S.C. § 547(c)(2). Under that provision, a transfer made within the preference period will not be avoided if the transfer was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; *and*

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (emphasis added).[2] Fujitsu must satisfy all three prongs of the standard to sustain its "ordinary course" defense. *White v. Bradford (In re Tax Reduction Inst.),* 148 B.R. 63, 72 (Bankr. D.D.C.1992). Webster stipulates that the payments at issue were made in connection with a debt incurred in the ordinary course of business between TMNG and NETtel as required by § 547(c)(2)(A).[3] Accordingly, the court need only inquire as to the second and third prongs of the standard.[4]

---

2. Under amendments to the Bankruptcy Code in 2005, which do not apply in this case, the provisions of § 547(c)(2)(A) addressed in this case now appear in the opening text of § 547(c)(2) without being placed in a separate paragraph. Additionally, the provisions of §§ 547(c)(2)(B) and 547(c)(2)(C) addressed in this case are now numbered, respectively, §§ 547(c)(2)(A) and 547(c)(2)(B). Finally, unlike the version of § 547(c)(2) applicable here, a creditor need no longer satisfy the requirements of both § 547(c)(2)(A) (old § 547(c)(2)(B)) or § 547(c)(2)(B) (old § 547(c)(2)(C)), and is required to satisfy the requirements of either paragraph. Because the amendments do not apply in this case, this memorandum decision employs the pre–2005 version of the statute.

3. As already noted, under the amendments to the Bankruptcy Code in 2005, which do not apply in this case, § 547(c)(2)(A) now appears in the opening clause of § 547(c)(2) and is not assigned a separate paragraph.

4. Webster has not addressed the § 547(c)(2)(B) issue in his opposition to Fujitsu's motion for summary judgment, but he has not expressly conceded the issue, either. In his memorandum in support of his own motion for summary judgment, he points to a "payment plan," (Pl.Mem.2–3), which implies that Webster finds such a plan objectionable. In any event, the court must satisfy itself that Fujitsu has demonstrated that summary judgment is appropriate by assessing whether Fujitsu has satisfied the second prong of the

## A. Section 547(c)(2)(B)[5]

■ "The courts look to the course of the conduct between the debtor and the transferee in evaluating § 547(c)(2)(B)." *In re Tax Reduction Inst.*, 148 B.R. at 72. "If the transfer[s][are] out of the ordinary course of the business affairs between the parties, even viewed in a vacuum, it becomes unnecessary to view the transfer against the background of all of the debtor's affairs." *Id.* at 74. But where there is no discrepancy between the parties' past dealings and their transactions during the preference period, the court "must also take account of whether the payment is ordinary within the course of the debtor's ... business with all creditors." *Id.* "[T]he most important thing is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period." *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993).

■ "However, 'there is no precise legal test which can be applied' in determining whether payments by the [d]ebtor during the ninety day preference period were 'made in the ordinary course of business[;'] 'rather, th[e] court must engage in a "peculiarly factual" analysis.'" *Trinkoff v. Porters Supply Co., Inc. (In re Daedalean, Inc.)*, 193 B.R. 204, 211 (Bankr.D.Md. 1996) (quoting *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991) (further quotation omitted)). "Among the factors courts consider in determining whether transfers are ordinary in relation to past practices are: 1) the length of time the parties were engaged in the transac-

tions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and[ ] 4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.)*, 25 F.3d 728, 732 (9th Cir.1994). As stated in *Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.)*, 153 F.3d 915 (8th Cir.1998):

> The controlling factor is whether the transactions between the debtor and the creditor, both before and during the ninety-day period, were consistent. *See Lovett*, 931 F.2d at 497. "[T]he analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90–day period reflected 'some consistency' with that practice." *Id.* at 498.

*Id.* at 917.

■ "[T]he hallmark of a payment in the ordinary course is consistency with prior practice...." *Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.)*, 132 F.3d 104, 110 (1st Cir.1997) (citing *WJM, Inc. v. Mass. Dep't of Pub. Welfare*, 840 F.2d 996, 1011 (1st Cir.1988)).

Moreover, a genuine dispute of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Farmland Indus., Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C.Cir.1990) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Although the § 547(c)(2)(B) inquiry is factbound, that does not preclude summary judgment in a creditor's favor if the evidence does not

---

"ordinary course" defense as well as the third.

5. As noted previously, under the amendments to the Bankruptcy Code in 2005, which do not apply in this case, § 547(c)(2)(B) has been renumbered § 547(c)(2)(A).

reasonably support a finding that § 547(c)(2)(B) is inapplicable. *See Webster v. The Management Network Group, Inc. (In re NETtel Corp., Inc.),* 364 B.R. 433, 443–44 (Bankr.D.D.C.2006) (factbound inquiry did not bar summary judgment in favor of trustee when evidence did not reasonably support a finding that § 547(c)(2)(B) was applicable).

### 1. *The parties' consistent course of conduct*

■ The facts relevant to this issue are not in dispute, leaving the court with the task of determining whether, as a matter of law, § 547(c)(2)(B) applies given the undisputed facts. DMR issued its first invoice on September 13, 1999. (Erickson Decl. at Ex. C).[6] From September of 1999 to March of 2000, NETtel made five payments on six invoices aged between forty-four and seventy-one days. (Erickson Decl. at Ex. C.) With the exception of one payment made on two invoices issued the same day, each of these first six payments corresponded to a single invoice not exceeding $5,000.00. (Erickson Decl. at Ex. C.)

NETtel's payment schedule appears to have changed after its March 15, 2000 payment on invoice number 0141498. It did not make another payment until April 19, 2000, when it issued a check for $288,608.96 to cover an invoice dated December 16, 1999, in the amount of $268,978.00, as well as ten other invoices ranging from $165.00 to $5,458.87 in amount and dated between November 1, 1999, and February 8, 2000. (Erickson

Decl. at Ex. C.) It issued another check on April 27, 2000, in repayment of an invoice dated January 12, 2000, in the amount of $354,457.60. On May 19, 2000, and June 6, 2000, NETtel made two payments of $100,000.00 each on a single invoice dated February 9, 2000 (invoice number 0144380). (Erickson Decl. at Ex. C.) The amount owed on the invoice was $453,290.80. (Erickson Decl. at Ex. C.)

On the face of it, there appears to be little consistency regarding NETtel's payments prior to the preference period other than its failure to make any payments on larger DMR invoices prior to April of 2000. But Fujitsu has also provided a declaration from William Barkdoll, former Manager of Accounting Services for NETtel, which gives needed context to NETtel's seemingly random payment history.[7] Specifically, Barkdoll states that

> the *timing* of payments by NETtel to its vendors was directly related to the timing of infusions of funding to NETtel from NETtel's investors and lenders; and ... the *amount* of payments made by NETtel to its vendors was directly related to the availability of funding from such infusions and to NETtel's ordinary practice of paying its vendors some portion of the total amount it owed to them based on what NETtel could reasonably afford to pay and based on NETtel's desire to demonstrate a good faith effort to reduce the amount of vendors' receivables and maintain good will with such vendors.

(Barkdoll Decl. ¶ 4) (emphasis added).

Barkdoll further states that NETtel received cash infusions of $6 million in early

---

6. While Webster objects to the admission of the contents of Fujitsu Controller and Vice–President Richard Erickson's declaration, see part III.B, *infra,* presumably he does not object to the admission of the exhibits authenticated by that declaration. To the extent that he does object to the admission of the Erickson declaration exhibits, Webster's objection

is overruled for the reasons set forth in part III.B.

7. Webster does not object to the admission of the Barkdoll declaration. Instead, he objects only to the declaration of Richard Erickson, Vice–President and Controller of Fujitsu.

April of 2000, (Barkdoll Decl. ¶ 9), $10 million "on or about April 20, 2000," (Barkdoll Decl. ¶ 10), $1.5 million in "May 2000 and/or June 2000," (Barkdoll Decl. ¶ 16), $14 million "[o]n or about the second week of July 2000," (Barkdoll Decl. ¶ 19), and $10 million "in early August 2000." (Barkdoll Decl. ¶ 22.) Each of these cash infusions led to payments to NETtel's vendors, including Fujitsu. (Barkdoll Decl. ¶¶ 11–13, 17–18, 20–21, & 23–24.) Payments were not made in response to specific overdue invoices, but rather were made to satisfy a "reasonable proportion of the total payable balance" owed to each vendor depending on the size of the infusion. (Barkdoll Decl. ¶ 11.)

Barkdoll's declaration explains much of the apparent inconsistency in the parties' course of business prior to the preference period. While NETtel's payments vary in terms of size, number of invoices covered, and length of time from issuance of a particular invoice to that invoice's payment, they correspond roughly to the dates and amounts of "infusion[s]" from NETtel's lenders and investors. For example, NETtel's April 19 payment of $288,608.96 followed NETtel's early April infusion of $6 million, representing 4.8% of the infusion, while its April 27 payment of $354,457.60 followed NETtel's larger infusion of $10 million "on or about April 20, 2000," representing 3.5% of that infusion. Finally, NETtel's May 19 and June 6 payments of $100,000 were each made in part in response to the infusion of $1.5 million in May or June, representing 13.6% of the May/June infusion. Alternatively, if the May 19 payment to NETtel preceded the May/June infusion, the final pre-prefer-

ence period payment on June 6, 2000, represented 6.7% of the May/June infusion.

### 2. The effect of the "payment plan"

Webster has submitted evidence that NETtel's preference period payments were made pursuant to a "payment plan" entered into by the parties in July of 2000. (Pl. Mem. at Ex. 6 (Nicolette Dep. at 40–42, 45–46, 81–82, 84).) The plan called for a $1,000,000.00 payment to DMR in July and a payment in the amount of $800,000.00 in August, with a goal of paying off all past due amounts by October of 2000. (Pl. Mem. at Ex. 6 (Nicolette Dep. at 81–82, 84).) This plan was in fact followed by NETtel, except that its August payment was smaller than initially promised by approximately $200,000.00. To the extent that this plan changed the payment practices of NETtel, it could be said to have rendered payments made pursuant to the plan outside the course of business between the parties during the pre-preference period.

■ But the payment plan is *not* inconsistent with the course of business described above. NETtel's July 17, 2000 payment of $1,000,001.00, while considerably larger than the payments preceding it, also followed a much larger cash infusion of $14 million in the second week of July. Indeed, the difference between the percentage of cash used from the July 17 infusion to pay DMR (7.1%) and the percentage of cash used from the May and June infusions to pay DMR (6.7% using the calculation most favorable to Webster) is negligible.[8] And NETtel's August 14

8. Negligible deviations from past practices do not demonstrate non-ordinariness. *See Brown v. Shell Canada Ltd. (In re Tenn. Chem. Co.)*, 112 F.3d 234, 237–38 (6th Cir.1996) (finding nothing out of the ordinary in payment "based upon a few days' deviation from the overall pattern of payment" and holding that payments are not out of the ordinary "unless substantial deviations from established practices occur"). Moreover, Webster did not dispute Fujitsu's statement of uncontested fact under Local Bankr.R. 7056–1 that

payment of $602,593.98 to DMR actually consumed *less* of that month's cash infusion (6.0%) than the payment made in June. Finally, the terms of the payment plan were set around the cash infusions received by NETtel, (Pl. Mem. at Ex. 6 (Nicolette Dep. at 41–42)), and were, according to Webster's own evidence, "based on [NETtel's] previous payment pattern with [DMR]. . . ." (Pl. Mem. at Ex. 6 (Nicolette Dep. at 42).) The parties' "payment plan" was really just a formalization of payment practices already employed by NETtel.

The Barkdoll declaration only confirms the ordinariness of NETtel's preference period payments when viewed in the context of how NETtel treated its other creditors. Barkdoll states that "NETtel used the prospect of [capital] funding in discussions with vendors in an effort to reassure them that NETtel's imminent receipt of funding would soon enable NETtel to provide significant overdue payments against their invoices," and set up "at least 75 to 100" payment plans establishing a pattern of payments like the one at issue here with other NETtel vendors during the pre-preference period, all of them "based, in large part, on NETtel's anticipated receipt of working capital infusions." (Barkdoll Decl. ¶ 15.) It appears that, with respect to DMR, NETtel simply made payments as if such a plan were already in effect until DMR inquired as to the status of aging accounts receivable, at which time NETtel formalized the payment scheme it had already put into place.

■ When a creditor asks a debtor in a non-coercive fashion to confirm that it will continue to make payments in the same manner as pre-dated the preference period, and the debtor confirms that it will do so, the lack of a change in the parties'

payment pattern requires that the parties be treated as having acted in an ordinary fashion for purposes of § 547(c)(2)(B). *See HLI Creditor Trust v. Metal Technologies Woodstock Corp. (In re Hayes Lemmerz Int'l, Inc.)*, 339 B.R. 97, 107 (Bankr.D.Del. 2006); *Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 315 B.R. 443, 459, 462–64 (Bankr.S.D.Ohio 2004). This is not a case of a creditor making extraordinary or unusual collection efforts to prompt the debtor to make payments to the creditor as it had in the past. *See Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986) ("To the extent an otherwise 'normal' payment occurs in response to ['unusual' debt collection or payment practices], it is without the scope of § 547(c)(2)."); *Jacobs v. Matrix Capital Bank (In re AppOnline.com)*, 315 B.R. 259, 284–86 (Bankr.E.D.N.Y. 2004) (same).

Instead, unrebutted evidence of record demonstrates that DMR merely inquired as to the status of its payments. NETtel responded with a payment plan consistent with its pre-preference period practice of making significant payments of its invoices upon receiving capital infusions. NETtel merely followed that practice as it had planned all along.

■ The danger of a creditor bringing to bear unusual collection efforts to force a debtor on the brink of bankruptcy to adhere to its prior payment practices is that will often result in that creditor receiving favored treatment. However, a creditor ought not be penalized for simply inquiring, in a non-coercive fashion, into the status of its payments, nor should it be penalized because the debtor formally acknowledged the existence of a payment

---

NETtel's payments to creditors out of capital infusions received in July were consistent

with its ordinary approach in the pre-preference period.

plan consistent with its prior practices in response to that inquiry.

Looking only to the foregoing discussion of the implicit pre-preference period payment plan and the express preference period plan, which did not materially differ, NETtel's preference period payments were not so unusual as to fall outside the ordinary course of business between the parties. However, the case law suggests that the length of delay in making payment is an additional factor which may be taken into account, if relevant.

### 3. *The age of the invoices when paid*

For reasons discussed later, the age of paid invoices when paid is a red herring in this case because the parties did not look to the age of outstanding invoices to determine when and in what amount payment would be made. In addition, Fujitsu's statement of material facts not in genuine dispute under Local Bankr.R. 7056–1 recites that NETtel's payments to vendors

out of the capital infusions in July and August of 2000 were consistent with its ordinary approach in the pre-preference period. (Def. Stmt. of Facts ¶¶ 45, 48). Webster did not file a statement pursuant to Local Bankr.R. 7056–1 challenging any of the facts Fujitsu set forth in its statement of undisputed facts. In addition, Webster has not otherwise challenged those recitations (except indirectly by raising the argument, already rejected, that there was a "payment plan" which made the preference period payments to DMR unusual). Accordingly, under Local Rule 7056–1, the court can treat the timing of the preference period payments to DMR as consistent with the parties' prior dealings. Nevertheless, for the sake of completeness, the court will review the age of invoices when paid.

It is useful first to summarize in tabular form the parties' payment history in the pre-preference period:

| Check Date/ Infusion of Capital Date | Check Amount (or Infusion Amount) | Invoice Date | Invoice No. | Invoice Amount Paid | Days Lapsed Until Check Issued |
|---|---|---|---|---|---|
| 11/02/99 | $ 2,215.28 | 09/13/99 | 0134147 | $ 2,215.28 | 50 |
| 11/18/99 | $ 4,207.72 | 09/28/99 | Various | $ 4,207.72 | 51 |
| 12/20/99 | $ 1,600.22 | 11/01/99 | 0137722 | $ 1,600.22 | 49 |
| 01/24/00 | $ 1,282.13 | 12/08/99 | 0139842 | $ 1,282.13 | 47 |
| 03/15/00 | $ 5,000.00 | 01/04/00 | 0141498 | $ 5,000.00 | 71 |
| Early April 2000 Infusion | $ 6,000,000.00 (approximately) | | | | |
| 04/19/00 | $ 288,608.96 | 12/09/99 | 019173E | $ 2,684.76 | 132 |
| | | 12/16/99 | 0141268 | $268,978.00 | 125 |
| | | 01/11/00 | Various | $ 10,391.34 | 99 |
| | | 01/31/00 | 0143309 | $ 1,584.00 | 79 |
| | | 02/08/00 | Various | $ 4,970.86 | 71 |
| 04/20/00 Infusion | $10,000,000.00 | | | | |
| 04/27/00 | $ 354,457.60 | 01/12/00 | 0142547 | $354,457.60 | 106 |
| 05/19/00 | $ 100,000.00 | 02/09/00 | 0144380 | $100,000.00 (of $453,290.80) | 100 |
| May or June 2000 Infusion | $ 1,500,000.00 | | | | |
| 06/06/00 | $ 100,000.00 | 02/09/00 | 0144380 | $100,000.00 (of $453,290.80) | 118 |

When the payments are applied to the oldest invoices first, the maximum age of an invoice before it was paid was 125 days.[9]

In tabular form, the parties' payment history in the preference period was as follows:

| Check Date/ Infusion of Capital Date | Check Amount (or Infusion Amount) | Invoice Date | Invoice No. | Invoice Amount Paid | Days Lapsed Until Check Issued |
|---|---|---|---|---|---|
| 2d Wk. of July 2000 | $14,000,000.00 Infusion | | | | |
| 07/17/00 | $ 1,000,001.00 | 02/09/00 | 144380 | $253,290.80 bal. | 159 |
| | | 03/24/00 | 1446775 | $418,517.60 | 115 |
| | | 04/06/00 | 0147959 | $328,192.60 (of $381,805.60) | 102 |
| Early August 2000 | $10,000,000.00 Infusion | | | | |
| 08/14/07 | $ 602,693.98 | 02/08/00 | Various | $ 13,532.55 | 188 |
| | | 03/07/00 | Various | $ 33,400.80 | 160 |
| | | 03/23/00 | 0146739 | $ 8,400.00 | 144 |
| | | 04/06/00 | Various | $521,758.08 [10] | 130 |
| | | 04/13/00 | 0148528 | $ 14,400.00 | 123 |
| | | 05/03/00 | Various | $ 11,202.55 | 103 |

NETtel designated some of the checks for payment of later invoices when there were earlier invoices that were not yet paid, but those arbitrary designations must be disregarded. In determining whether payments in the preference period comport with what transpired in the pre-preference period, and thus satisfy § 547(c)(2)(B), "[i]t is a debtor's delay [in the two periods] in reducing the debts by an amount exceeding the oldest invoice that counts economically in assessing a debtor's delay in making payment of invoices." *In re NETtel Corp., Inc.*, 364 B.R. at 445 (footnote omitted). As explained in that decision:

Assume a debtor makes a payment of $100 to its creditor when it has one invoice outstanding for $100 that is 200 days old and another invoice outstanding for $200,000 that is 10 days old. The delay in making payment of its debts has, so far, reached 200 days. Assume that 150 days later, the debtor makes a second payment of $200,000 (which is 350 days since the $100 debt was invoiced and 160 days since the $200,000 debt was invoiced). For the two pay-

9. Had $2,684.76 of the March 15, 2000 check been applied to the December 9, 1999 invoice instead of the later January 4, 2000 invoice, the lapsed days between the December 9, 1999 invoice date and the March 15, 2000 check date would have been only **46 days (not 132 days)**. If, in that event, $2,684.76 of the January 4, 2000 invoice had been paid from the April 19, 2000 check, the lapsed days between the January 4, 2000 invoice and the April 19, 2000 check would be **96 days** (which is less than the **125-day** lapse days it took to pay the December 16, 1999 invoice in full).

10. This amount includes payment of the remaining balance of Invoice No. 0147959.

ments, the range of delay in paying the debtor's debts would be **160 days to 200 days.** It should not be viewed as a quite different range of **10 days to 350 days** when the debtor arbitrarily designates the first payment of $100 for application against the later invoice for $200,000. Once that debtor enters the preference period, a payment made on a further invoice at either 10 days or 350 days after the invoice date ought not be treated as comporting with the economic reality of what transpired in the pre-preference period.

*Id.* at 445 n. 7 (emphasis in original).

When NETtel's pre-preference period payments are applied first to the oldest invoices, the consequence is that the longest delay in issuing a check after the issuance of an invoice in the pre-preference period would be 125 days. In the preference period, applying the payments to the oldest invoices first would result in the following:

| Check Date/ Infusion of Capital Date | Check Amount (or Infusion Amount) | Invoice Date | Invoice No. | Invoice Amount Paid | Days Lapsed Until Check Issued |
|---|---|---|---|---|---|
| 2d Wk. of July 2000 | $14,000,000.00 Infusion | | | | |
| 07/17/00 | $ 1,000,001.00 | 02/09/00 | 144380 | $253,290.80 bal. | 159 |
| | | 02/08/00 | Various | $ 13,532.55 | 160 |
| | | 03/07/00 | Various | $ 33,400.80 | 132 |
| | | 03/23/00 | 0146739 | $ 8,400.00 | 116 |
| | | 03/24/00 | 1446775 | $418,517.60 | 115 |
| | | 04/06/00 | 0147959 | $272,859.25 (of $381,805.60) | 102 |
| Early August 2000 | $10,000,000.00 Infusion | | | | |
| 08/14/07 | $ 602,693.98 | 04/06/00 | Various | $577,091.43 [11] | 130 |
| | | 04/13/00 | 0148528 | $ 14,400.00 | 123 |
| | | 05/03/00 | **Various** | $ 11,202.55 | 103 |

The payments of the bolded invoices, totaling $725,379.40, were all made less than 125 days after the issuance of the invoices (if the payments are applied, as in the table, first to the oldest invoices), and thus the age of those invoices when paid did not vary from the preference period range for the age of invoices when paid. Accordingly, those payments were ordinary between the parties under § 547(c)(2)(B).

The other payments, totaling $877,315.28, had an age-of-invoice-when-paid range of 130 to 160 days (when the payments are applied first to the oldest invoices). This range is 5 to 35 days more than the maximum of 125 days for the range in the pre-preference period. When focused only on the age of invoices when paid, and despite the only slight number of days by which some of these preference period payments exceeded the pre-preference range, a finder of fact could reasonably view these payments as having not been made in the ordinary course of business affairs of NETtel and DMR as required by § 547(c)(2)(B).[12]

---

**11.** This amount includes payment of the remaining balance of Invoice No. 0147959.

**12.** However, a finder of fact could also reasonably view the slight differences in timing of at least some of the payments as insignifi-

The reality, however, is that the court would have to turn a blind eye to other relevant evidence of record in the case to make this kind of inference. Specifically, the Barkdoll declaration establishes that the age of an invoice was not a factor in determining when payments would be made in the course of business between NETtel and DMR; instead, the parties looked to cash infusions from NETtel's investors as the determining factor as to both the timing and amount of payments. Although courts traditionally focus on the delay in payment as an important factor to consider under § 547(c)(2)(B), that inquiry arises from the (usually accurate) assumption that the timing of payments was based on the age of invoices. Where, as here, the record is clear that the amount and timing of NETtel's payments was never tied to the age of invoices issued by DMR, the age of those invoices at the time of payment is irrelevant.

On Fujitsu's motion for summary judgment, and even though a trial of this matter would be a non-jury trial, the court must decide whether, when the evidence is viewed in the light most favorable to Webster, a finder of fact could reasonably find that these payments were not made in the ordinary course of the business affairs of NETtel and DMR. Given the uncontroverted evidence that NETtel and DMR looked to infusions of capital as controlling both the timing and amount of payments, a finder of fact could not reasonably find that the payments in the preference period were out of the ordinary course of business affairs of NETtel and DMR based on the age of invoices when paid.

cant. *See Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.),* 182 B.R. 728, 737 (Bankr.W.D.Va.1995).

### 4. *Conclusion*

To recapitulate, the focus of § 547(c)(2)(B) is the consistency of the preference transfers with prior practice. The parties' prior practice in this case did not turn on the age of invoices. Instead, the timing and amount of payments, both during and before the preference period, was based on the timing of capital contributions to NETtel, and DMR brought no unusual collection efforts to bear on NETtel during the preference period. Accordingly, the preference period payments were in the ordinary course of NETtel's and DMR's business affairs, and Fujitsu is entitled to partial summary judgment on the § 547(c)(2)(B) issue.

### B. *Section 547(c)(2)(C)*[13]

To satisfy the final prong of the "ordinary course" defense, Fujitsu must demonstrate that NETtel's preference period payments were made in accordance with the " 'practices in which firms similar in some general way to the creditor in question engage.' " *NMI Systems, Inc. v. Pillard (In re NMI Systems, Inc.),* 179 B.R. 357, 373 (Bankr.D.D.C.1995) (quoting *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1033 (7th Cir.1993)). "[T]he court is not required to find a single industry norm" in deciding whether a particular course of conduct was conducted according to ordinary business terms. *Id.* Rather, " 'only dealings so idiosyncratic as to fall outside th[e] broad range [of industry practices] should be deemed extraordinary and therefore outside the scope of subsection C.' " *Id.* (quoting *In re Tolona Pizza Products Corp.,* 3 F.3d at 1033).

**13.** As noted previously, under the amendments to the Bankruptcy Code in 2005, which do not apply in this case, § 547(c)(2)(C) has been renumbered § 547(c)(2)(B).

 Fujitsu relies on the Erickson and Barkdoll declarations to support its position that the parties' course of conduct was ordinary in the IT consulting industry. Webster objects to the admission of Erickson's declaration—and only Erickson's declaration [14]—on the grounds that his testimony was not disclosed prior to the close of discovery and that it is inadmissible opinion testimony pursuant to Fed.R.Evid. 702 [15] because Erickson was not qualified as an expert witness. Webster has not filed an affidavit under Fed.R.Civ.P. 56(f) presenting reasons why he cannot present by affidavit facts to rebut Erickson's declaration, nor has he asked for an opportunity to depose Erickson further. Instead, he attacks Erickson's declaration on the grounds indicated: namely, lack of disclosure in discovery and the alleged expert opinion character of the declaration.

Fujitsu made Erickson available as its Rule 30(b)(6) witness for purposes of testifying with respect to Fujitsu's § 547(c)(2) defense, and Webster *actually deposed* Erickson on this issue, albeit only in a superficial manner. (Gorelick Decl. II at Ex. B (Erickson Dep. 83–85).) Webster cannot credibly claim to be unfairly surprised by the Erickson declaration when his counsel had the opportunity to question Erickson on the very same issues raised in the declaration.[16] Fujitsu did not fail to disclose the information presented by the Erickson declaration in its answers to discovery; rather, Webster's counsel simply failed to ask Erickson what he knew with respect to the § 547(c)(2)(C) issue in any detail at Erickson's deposition. Thus, there is no basis on which to exclude Er-

**14.** Webster erroneously views the Erickson declaration as the only evidence submitted by Fujitsu concerning the third prong of the "ordinary course" exception. (Pl.Suppl.Opp.2). He does not object to the admissibility of the Barkdoll declaration, filed on the same date as the Erickson declaration.

**15.** Rule 702 of the Federal Rules of Evidence states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness *qualified as an expert* by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (emphasis added); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Unlike an ordinary witness, ... an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

**16.** Webster's counsel asked Erickson, "What are the facts supporting Fujitsu's defense that the payments received from NETtel were received in the ordinary course of business?" (Gorelick Decl. II at Ex. B (Erickson Dep. 83).) Erickson, apparently interpreting this question to be directed towards § 547(c)(2)(B) (*i.e.,* whether the payments were "made in the ordinary course of business ... of the debtor and [DMR]"), replied that "NETtel was treated no differently than any other customer that the company had with regard to how we viewed its status or what, you know, how we billed it, how we did anything with regard to NETtel." (Gorelick Decl. II at Ex. B (Erickson Dep. 83).) In response to follow-up questions to this answer, Erickson indicated that "many of our clients in ... [t]he IT consulting industry ... aren't paying within thirty days," (Gorelick Decl. II at Ex. B (Erickson Dep. 84)), and that he based this knowledge in part on being in the IT industry since 1979. (Gorelick Decl. II at Ex. B (Erickson Dep. 84).) Despite this testimony, Webster's counsel failed to inquire as to what else Erickson knew regarding industry practices that would be pertinent to a determination as to whether NETtel's payments to DMR were "made according to ordinary business terms" (the relevant inquiry under § 547(c)(2)(C)).

ickson's declaration under Rule 37(c)(1).[17]

 Webster's second argument— that Erickson's testimony is inadmissible opinion testimony—also fails to pass muster. Erickson's declaration testimony, like that of Barkdoll, is based on his personal experiences. Neither witness needs to be qualified as an expert because neither witness has given expert testimony. Rather, Barkdoll and Erickson have provided lay opinion testimony based on their years of experience and personal observations as permitted by Fed.R.Evid. 701.[18] This testimony does not require qualification of the witness as an expert to be admissible. *See Williams Enterprises, Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230, 234 (D.C.Cir. 1991) (lay witness with personal knowledge of facts "was entitled to draw conclusions and inferences from those facts—regardless of whether he applied any specialized expertise").[19] Nor is there any requirement in § 547(c)(2)(C) that evidence of industry-wide practices come from an expert witness.[20]

**17.** Although Webster served interrogatories (specifically, Interrogatories Nos. 18 & 19) inquiring into the facts supporting Fujitsu's § 547(c)(2)(C) defense, he did not move to compel answers to these interrogatories when Fujitsu objected to the interrogatories without answering them. Moreover, Fujitsu designated Erickson under Fed.R.Civ.P. 30(b)(6) to testify regarding Fujitsu's affirmative defenses (topic 14 of Webster's notice to take Fujitsu's deposition). (Gorelick Decl. II at Ex. B (Erickson Dep. 66–67).)

**18.** Rule 701 of the Federal Rules of Evidence states:
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witnesses, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed.R.Evid. 701.

**19.** Webster relies on *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200 (4th Cir.2000) ("*Sinkovich*"), to support his position that Erickson's statements are the result of specialized knowledge and must be excluded. (Pl. Suppl. Opp. 7–8 (citing *Sinkovich*, 232 F.3d at 203–04)). While the court in *Sinkovich* stated that Rule 701 "generally does 'not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness,'" *Id.* (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir.1979)), the court's comment referred to answers to hypothetical questions from an unqualified witness who had no "first-hand knowledge of the accident" and whose conclusions were not "ones that a normal person would form based upon his observations," *Id.*, but rather were the results of the witness's investigation and analysis of his own data. *Id.* The declarations of Barkdoll and Erickson, in contrast, reflect only the declarants' own observations and do not opine on hypothetical matters requiring an application of expert knowledge.

**20.** *See, e.g., In re NMI Systems, Inc.*, 179 B.R. at 373 (vice-president's testimony regarding bonus offers in industry based on witness's personal experience established range of industry practices for purposes of § 547(c)(2)(C)); *Jones v. United Savings and Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Ark., Inc.)*, 9 F.3d 680, 685 (8th Cir. 1993) (creditor's president's testimony was sufficient to prove an industry-wide practice of dealing with real estate loans); *Mossay v. Hallwood Petroleum, Inc.*, 1997 WL 222921, *3 (N.D.Tex.1997) (contract administrator's testimony as to whether particular form was standard in the gas industry was admissible because it was based on administrator's personal experience and was helpful to the court) (citing *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir.1997)); *Solow v. Ogletree, Deakins, Nash, Smoak & Stewart (In re Midway Airlines, Inc.)*, 180 B.R. 1009, 1017 (Bankr. N.D.Ill.1995) (lawyer's testimony based on personal knowledge of industry practices in the "domestic air carrier-legal service industry" were admissible for purposes of 11 U.S.C. § 547(c)(2)(C)); *McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185

The issue is moot in any event because the Barkdoll declaration, by itself, satisfies the requirements of § 547(c)(2)(C). Barkdoll stated in his declaration that he has had personal familiarity with the billing and collections practices for information technology consulting services since 1996. (Barkdoll Decl. ¶¶ 25–26.) According to Barkdoll, "it is customary for vendors in that industry to not enforce the strict payment terms provided for in their contracts and/or on their invoice," (Barkdoll Decl. ¶ 27) because IT consultants generate labor through on-site consulting, which would be difficult to terminate in the face of late payments without jeopardizing the entire vendor-client relationship. (Barkdoll Decl. ¶ 28.) Barkdoll also states that it was customary for IT consulting firms in the period from 1999 to 2000 to "be informed and accept that the amount of timing of payments may be tied to the amount and timing of such infusions," (Barkdoll Decl. ¶ 29), because so many clients of IT consulting firms were "start up companies" that "did not generate sufficient revenues from operations and were dependent on outside infusions of loans or working capital. . . ." (Barkdoll Decl. ¶ 29.)

Webster has provided no evidence to rebut either the Barkdoll declaration or the Erickson declaration.[21] While hardly overwhelming, the Barkdoll declaration provides enough evidence of the relevant industry standards by itself to satisfy the requirements of 11 U.S.C. § 547(c)(2)(C). The court need not even consider the substance of Erickson's declaration to rule in favor of Fujitsu on this point. The court will grant Fujitsu's motion for summary judgment with respect to its "ordinary course" defense.

## IV

## "NEW VALUE" DEFENSE

Fujitsu also asserts a partial affirmative defense in the amount of $246,356.46 under the "new value" provision found in 11 U.S.C. § 547(c)(4). Because the court has already concluded that Fujitsu is entitled to summary judgment on its first affirmative defense, the court does not need to consider the merits of this alternative defense.

## V

## CONCLUSION

For the reasons set forth above, the court will deny Webster's motion for summary judgment and grant Fujitsu's cross-motion for summary judgment with respect to its "ordinary course" defense as well as final judgment on this matter.

A judgment follows.

B.R. 103, 114–15 (Bankr.E.D.N.Y.1995) ("self-serving" testimony of creditor's vice president regarding debtors' history of long payment delays and payment history of its other customers was proper evidence of industry practice nonetheless).

21. The closest Webster comes to creating a genuine dispute over a material issue of fact is through his submission of excerpts from the deposition of Fujitsu Vice–President Alan Nicolette. Nicolette testified at his deposition that the standard billing practice of Fujitsu (and, previously, DMR) is to require "net 30 terms" (*i.e.*, a requirement that payments be made thirty days after issuance of the invoice). (Pl. Mem. at Ex. 6 (Nicolette Dep. at 92).) Other portions of his excerpted deposition make clear, however, that the phrase "net 30 terms" refers to the billing terms in Fujitsu's *contracts*, not the actual payment practices of its clients. (Pl. Mem. at Ex. 6 (Nicolette Dep. at 66).) There is no contradiction between this testimony and the payment practices at issue here, which were also made on a contract with "net 30 terms" that was, it seems, honored exclusively in the breach.